EXXON CORP. *v.* DEPARTMENT OF REVENUE OF
WISCONSIN

No. 79–509.   Argued March 18, 1980—Decided June 10, 1980

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined except STEWART, J., who took no part in the consideration or decision of the case.

*Thomas G. Ragatz* argued the cause for appellant. With him on the briefs were *Leonard S. Sosnowski, Lloyd M. McBride,* and *Paul D. Frenz.*

*Gerald S. Wilcox,* Assistant Attorney General of Wisconsin, argued the cause for appellee. With him on the brief was *Bronson C. La Follette,* Attorney General.*

---

*Briefs of *amici curiae* urging affirmance were filed by *William D. Dexter, Charles A. Groddick,* Attorney General of Alabama, *George Deukmejian,* Attorney General of California, *J. D. MacFarlane,* Attorney General of Colorado, *Richard Gebelein,* Attorney General of Delaware, *David H. Leroy,* Attorney General of Idaho, *Theodore L. Sendak,* Attorney General of Indiana, *Steven Sachs,* Attorney General of Maryland, *Frank J. Kelly,* Attorney General of Michigan, *Warren R. Spannaus,* Attorney General of Minnesota, *Mike Greely,* Attorney General of Montana, *Paul L. Douglas,* Attorney General of Nebraska, *Thomas D. Roth,* Attorney General of New Hampshire, *Jeff Bingaman,* Attorney General of New Mexico, *Rufus L. Edmisten,* Attorney General of North Carolina, *Albert R. Hausauer,* Special Assistant Attorney General of North Dakota, *James Redden,* Attorney General of Oregon, *Robert B. Hanen,* Attorney General of Utah, and *James R. Eads* for the Multistate Tax Commission et al.; and by *William J. Scott,* Attorney General of Illinois, and *Fred H. Montgomery* and *John*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case raises three important questions regarding state taxation of the income of a vertically integrated corporation doing business in several States. The first issue is whether the Due Process Clause of the Fourteenth Amendment prevents a State from applying its statutory apportionment formula to the total corporate income of the taxpayer when the taxpayer's functional accounting separates its income into the three distinct categories of marketing, exploration and production, and refining, and when the taxpayer performs only marketing operations within the State. The second issue is whether the Due Process Clause permits a State to subject to taxation under its statutory apportionment formula income derived from the extraction of oil and gas located outside the State which is used by the refining department of the taxpayer, or whether the State is required to allocate such income to the situs State. The third issue is whether the Commerce Clause requires such an allocation to the situs State.

## I

## A

Appellant Exxon Corp.,[1] a vertically integrated petroleum company, is organized under the laws of Delaware with its

_D. WhiteNack_, Special Assistant Attorneys General, _Carl R. Ajello_, Attorney General of Connecticut, _Francis X. Bellotti_, Attorney General of Massachusetts, and _Warren R. Spannaus_, Attorney General of Minnesota, for the State of Illinois et al.

Briefs of _amici curiae_ were filed by _Theodore J. Carlson, Davison W. Grant, Joseph J. Schumm, Jr._, and _Thomas C. Hutton_ for Associated Dry Goods Corp.; and by _Frank M. Keesling, pro se._

[1] The original taxpayer during the years in question was Humble Oil and Refining Co., a wholly owned subsidiary of Standard Oil Co. of New Jersey. In 1956, Standard Oil Co. of New Jersey organized as a wholly owned subsidiary Pate Oil Co., a Delaware corporation. Pate acquired all of the assets and liabilities of Saxon Corp., a Wisconsin company which marketed petroleum products and accessory products in that State. Pate

general offices located in Houston, Tex. During the years in question here, 1965 through 1968, appellant's corporate organization structure consisted of three parts: Corporate Management, Coordination and Services Management, and Operations Management.

Corporate Management, which was the highest order of management for the entire corporation, consisted of the board of directors, the executive committee, the chairman of the board (who was also the chief executive officer), the president, and various directors-in-charge who were members of the board of directors. Coordination and Services Management was composed of corporate staff departments which provided specialized corporate services. These services included long-range planning for the company, maximization of overall company operations, development of financial policy and procedures, financing of corporate activities, maintenance of the accounting system, legal advice, public relations, labor relations, purchase and sale of raw crude oil and raw materials, and coordination between the refining and other operating functions "so as to obtain an optimum short range operating program." App. 189; id., at 187–192.[2]

The third level of management within the corporation was

continued those marketing operations. In 1960, Pate was merged into Humble Oil and Refining Co., and the Wisconsin marketing operations were continued by that company under the brand name "Enco." In early 1973, Humble was merged into Standard Oil Co. of New Jersey, and the corporate name was changed to Exxon Corp. Exxon is the legal successor to Humble Oil and Refining Co. The taxpayer will be referred to throughout this opinion by its present name, Exxon.

[2] The corporate staff departments which were part of Coordination and Services Management, and which were not considered profit centers for accounting purposes by appellant, included: Corporate Planning Department, Secretary's Department, Supply Department, Treasury Department, Comptroller's Department, Tax Department, Law Department, Public Relations Department, Government Relations Department, Employee Relations Department, General Services Department, Medical Department, and Aviation Department. App. 189–192.

Operations Management, which was responsible for directing the operating activities of the functional departments of the company. These functional departments were Exploration and Production, Refining, Marketing, Marine, Coal and Shale Oil, Minerals, and Land Management. Each functional department was organized as a separate unit operating independently of the other operating segments, and each department had its own separate management responsible for the proper conduct of the operation. These departments were treated as separate investment centers by the company, and a profit was determined for each functional department.

At all relevant times each operating department was independently responsible for its performance. This arrangement permitted centralized management to evaluate each operation separately. Each department was therefore required to compete with the other departments for available investment funds, and with other members of the industry performing the same function for the company's raw materials and refined products. There was no requirement that appellant's crude oil go to its own refineries or that the refined products sold through marketing be produced from appellant's crude oil.

Transfers of products and raw materials among the three major functional departments—Exploration and Production, Refining, and Marketing—were theoretically based on competitive wholesale market prices. For purposes of separate functional accounting, transfers of crude oil from Exploration and Production to Refining were treated as sales at posted industry prices; transfers of products from Refining to Marketing were also based on wholesale market prices. If no readily available wholesale market value existed for a product, then representatives of the two departments involved would negotiate as to the appropriate internal transfer value.

Appellant had no exploration and production operations or refining operations in Wisconsin; the only activity carried out

in that State was marketing. The Wisconsin marketing district reported administratively to the central region office in Chicago, which in turn was responsible to the Marketing Department headquarters in Houston. App. 217. The motor oils, greases, and other packaged materials sold by appellant in Wisconsin during this period were manufactured outside the State and then shipped into that State from central warehouse facilities in Chicago. Tires, batteries, and accessories were centrally purchased through the Houston office and then shipped into Wisconsin for resale. The gasoline sold in Wisconsin was not produced by Exxon but rather was obtained from Pure Oil Co. in Illinois under an exchange agreement, permitting Exxon to reduce the cost of transporting the gasoline from its source to the retail outlets. This exchange agreement was negotiated by the Supply and Refining Departments. Additives were put into the Pure Oil gasoline in order to make the final product conform to uniform Exxon standards.

Exxon used a nationwide uniform credit card system, which was administered out of the national headquarters in Houston. Uniform packaging and brand names were used, and the overall plan for distribution of products was developed in Houston. Promotional display equipment was designed by the engineering staff at the marketing headquarters.

### B

Because appellant marketed its products in Wisconsin during the calendar years 1965 through 1968, it was required to file corporate income and franchise tax returns in that State for those years. Exxon prepared the returns based on separate state accounting methods, reflecting only the Wisconsin marketing operation. The returns showed losses in the amounts of $821,320 for 1965, $1,159,830 for 1966, $1,026,224 for 1967, and $919,575 for 1968. Accordingly, no tax was shown as being due for any of those years.

Appellee Wisconsin Department of Revenue audited Exxon for the years in question, and on June 25, 1971, the Department sent the taxpayer a notice of assessment of additional income and franchise tax. The Department concluded that pursuant to Wis. Stat. § 71.07 (2) (1967) [3] the Wisconsin marketing operation was "an integral part of a unitary business," and therefore Exxon's taxable income in Wisconsin must be determined by application of the State's apportionment formula to the taxpayer's total income. The Department's calculation revealed an additional taxable income of $4,532,155 for the period 1965 through 1968. Additional

---

[3] Wisconsin Stat. § 71.07 (2) (1967) during this period provided in relevant part:

"Persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state. The amount of such income attributable to Wisconsin may be determined by an allocation and separate accounting thereof, when the business of such person within the state is not an integral part of a unitary business, provided, however, that the department of taxation may permit an allocation and separate accounting in any case in which it is satisfied that the use of such method will properly reflect the income taxable by this state. In all cases in which allocation and separate accounting is not permissible, the determination shall be made in the following manner: There shall first be deducted from the total net income of the taxpayer such part thereof (less related expenses, if any) as follows the situs of the property. . . . The remaining net income shall be apportioned to Wisconsin on the basis of the ratio obtained by taking the arithmetical average of the following 3 ratios:

"(a) The ratio of the tangible property, real, personal and mixed, owned and used by the taxpayer in Wisconsin in connection with his trade or business during the income year to the total of such property of the taxpayer owned and used by him in connection with his trade or business everywhere. . . .

"(b) . . . the ratio of the total cost of manufacturing, collecting, assembling or processing within this state to the total cost of manufacturing, or assembling or processing everywhere. . . .

"(c) . . . the ratio of the total sales made through or by offices, agencies or branches located in Wisconsin during the income year to the total net sales made everywhere during said income year."

taxes in the amount of $316,470.85 were assessed against appellant.[4]

Exxon filed an application for abatement in July 1971, which the Department denied on November 30, 1971. Appellant then filed a petition for review with the Wisconsin Tax Appeals Commission. The Commission agreed with the Department that Exxon's separate geographical accounting did not accurately reflect its Wisconsin income for tax purposes. CCH Wis. Tax Rep. ¶ 201–223, p. 10,410 (1976). However, the Commission concluded that appellant's three main functional operating departments—Exploration and Production, Refining, and Marketing—were separate unitary businesses. *Id.,* at 10,409. According to the Commission, Exxon's marketing operation in Wisconsin was an integral part of its overall marketing function, but was not an integral part of its exploration and production function nor its refining function. *Id.,* at 10,411. The Commission found that the statutory apportionment formula as applied by the Department "had the effect of imposing a tax on the [appellant's] exploration and on its refining net income, all of which was derived solely from operations outside the State of Wisconsin and which had no integral relationship to the [appellant's] marketing operations within Wisconsin." *Id.,* at 10,410. The Commission also found that taxation by Wisconsin of Exxon's net income from its exploration and production function and its refining function would subject

---

[4] The additional net income was determined to be:

| | |
|---|---|
| 1965 | $759,371 |
| 1966 | $1,043,395 |
| 1967 | $1,264,946 |
| 1968 | $1,464,443 |

The additional taxes owed were determined to be:

| | |
|---|---|
| 1965 | $52,960.97 |
| 1966 | $72,842.65 |
| 1967 | $88,351.22 |
| 1968 | $102,316.01 |

appellant "to multiple-state taxation as to such income." *Ibid.* The Commission therefore concluded that the Department had erred in its application of the apportionment formula since it had included "extraterritorial income," but that "apportioning income earned by the [appellant] from its marketing function within and without the State of Wisconsin, would be proper. . . ." *Id.*, at 10,411.

The Circuit Court for Dane County set aside some of the factual findings and conclusions of law of the Tax Appeals Commission. CCH Wis. Tax Rep. ¶ 201-373, pp. 10,501-10,504 (1977). In particular, the Circuit Court held that the Commission's finding that Exxon's three main functional operating departments were separate unitary businesses was an erroneous conclusion of law. *Id.*, at 10,502. Similarly, the court set aside the findings that there was no economic dependence between the Wisconsin marketing operations and Exxon's exploration and production function or its refining function. *Ibid.* Instead the court held that "[t]he Wisconsin operation contributed sales to [Exxon's] business of producing, refining and marketing petroleum products. This contribution was sufficient alone in the opinion of this Court to make [Exxon's] business a unitary one." *Ibid.* Accordingly, appellant's business during the relevant years "considered as a whole both within and without Wisconsin constituted a unitary business" within the meaning of the apportionment statute. *Ibid.*

The Circuit Court concluded, however, that another statute, Wis. Stat. § 71.07 (1) (1967),[5] excluded from income subject to the apportionment formula all situs income derived

---

[5] Wisconsin Stat. § 71.07 (1) (1967) during this period provided in relevant part:

"For the purposes of taxation income or loss from business, not requiring apportionment under sub. (2), . . . shall follow the situs of the business from which derived. Income or loss derived from . . . the operation of any . . . mine . . . shall follow the situs of the property from which derived."

from appellant's oil and gas wells. CCH Wis. Tax Rep. ¶ 201–373, at 10,502–10,504. The Department had used a so-called "barrel formula" to separate two sets of income figures: income derived from the sale of crude oil to third parties, and income derived from crude oil produced by Exxon and transferred to its own refineries. The former was allocated to the situs State and excluded from Wisconsin taxable income, and the latter was included in the apportionment formula. A similar division was made of the income derived from appellant's gas production. The Circuit Court held that both sets of income were derived from the oil and gas wells and should be allocated to the situs State under the statute. The court noted that "there is no question but that the department's inclusion of [Exxon's] income derived from crude oil and gas produced and not sold to third parties by [Exxon's] production department resulted in double taxation of such income." [6] *Id.*, at 10,503.

The Wisconsin Supreme Court affirmed in part and reversed in part. 90 Wis. 2d 700, 281 N. W. 2d 94 (1979). That court concluded that the test for what constituted a unitary business was " 'whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such a relationship the business is unitary.' " *Id.*, at 711, 281 N. W. 2d, at 100, quoting G. Altman

---

[6] The Circuit Court also held that on remand the Tax Appeals Commission should determine whether the Department had properly weighted the apportionment formula. The apportionment formula uses three factors: sales, property, and manufacturing costs. See n. 3, *supra*. The Department adjusted the formula as to manufacturing costs because not all of the products sold through Exxon's Marketing Department were manufactured by Exxon; the Department divided by 2.6 rather than the statutory 3. The Wisconsin Supreme Court agreed that it was an issue for the Tax Appeals Commission on remand. 90 Wis. 2d 700, 731–735, 281 N. W. 2d 94, 111–113 (1979). That particular question is not before this Court.

& F. Keesling, Allocation of Income in State Taxation 101 (2d ed. 1950). Reviewing the organizational structure and business operations of Exxon, the court reasoned that Exxon's production and refining functions were dependent on its marketing operation to provide an outlet for its products, and Wisconsin was a part of that marketing system. In a high capital investment industry such as the petroleum industry, the court found, the existence of a stable marketing system was important for the full utilization of refining capacity. 90 Wis. 2d, at 718, 281 N. W. 2d, at 104. Accordingly, the court concluded that Exxon's Wisconsin marketing operations were an integral part of one unitary business and therefore its total corporate income was subject to the statutory apportionment formula. *Id.*, at 721–722, 281 N. W. 2d, at 105–106.

The Wisconsin Supreme Court disagreed with the Circuit Court on the issue of situs income. While the extraction and production of oil and gas constituted "mining" within the meaning of Wis. Stat. § 71.07 (1) (1967), 90 Wis. 2d, at 723, 281 N. W. 2d, at 106, the court agreed with the Department that situs income which is part of the unitary stream of income is nonetheless apportionable under the statute, while situs income which does not enter the unitary stream of income is nonapportionable and must be excluded from the formula. *Id.*, at 723–724, 281 N. W. 2d, at 106–107. The Wisconsin Supreme Court rejected appellant's contention that its separate functional accounting proved that its exploration and production income was earned totally outside Wisconsin, noting that "the idea of separate functional accounting seems to be incompatible with the 'very essence of formulary apportionment, namely, that where there are integrated, interdependent steps in the economic process carried on by a business enterprise, there is no logical or viable method for accurately separating out the profit attributable to one step in the economic process from other steps.' " *Id.*, at 726, 281 N. W. 2d, at 109, quoting J. Hellerstein, State and Local Taxation 400 (3d ed. 1969). The court concluded that the

State was acting within constitutional limitations despite appellant's evidence based on separate functional accounting.

The court also rejected Exxon's argument that the sources of income derived from exploration and production were all outside of Wisconsin and therefore could not be taxed in that State without impermissibly burdening interstate commerce. According to the court, Wisconsin was taxing only its "fair share" of appellant's income, there was a substantial nexus between appellant and the State, the tax was not claimed to discriminate between interstate and intrastate commerce, and the tax was fairly related to services provided by Wisconsin. 90 Wis. 2d, at 729–731, 281 N. W. 2d, at 110–111.

Because of the importance of the issues raised, we noted probable jurisdiction, 444 U. S. 961 (1979). We now affirm.

## II

We recently set forth at some length the basic principles for state taxation of the income of a business operating in interstate commerce, see *Mobil Oil Corp.* v. *Commissioner of Taxes,* 445 U. S. 425, 436–442 (1980), and need not repeat them here in great detail. It has long been settled that "the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs." *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 460 (1959); *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 436. See generally *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113 (1920); *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell,* 283 U. S. 123 (1931); *Butler Bros.* v. *McColgan,* 315 U. S. 501 (1942); *Moorman Mfg. Co.* v. *Bair,* 437 U. S. 267 (1978). See also *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924). The Due Process Clause of the Fourteenth Amendment imposes two requirements for such state taxation: a "minimal connection" or "nexus" between the interstate activities and the taxing State, and "a

rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 436, 437. See *Moorman Mfg. Co.* v. *Bair, supra,* at 272–273; *National Bellas Hess, Inc.* v. *Department of Revenue,* 386 U. S. 753, 756 (1967); *Norfolk & Western R. Co.* v. *State Tax Comm'n,* 390 U. S. 317, 325 (1968). The tax cannot be "out of all appropriate proportion to the business transacted by the appellant in that State." *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell, supra,* at 135.

The nexus is established if the corporation "avails itself of the 'substantial privilege of carrying on business' within the State." *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 437, quoting *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444–445 (1940). In the present case, Exxon does not dispute that it avails itself of that privilege through its marketing operations within Wisconsin. Appellant contends, however, that this nexus is insufficient to permit inclusion of all of Exxon's corporate income within the apportionment formula. While appellant appears to concede that Wisconsin may properly apply its apportionment statute to Exxon's Marketing Department income as established by its separate functional accounting, see Brief for Appellant 18, 29, 33; Reply Brief for Appellant 2–3, it argues that it has demonstrated through its accounting method what portion of its income is derived from exploration and production and from refining—functions which do not occur in Wisconsin and of which the marketing operation in that State is not an integral part.

Appellant relies heavily on *Moorman Mfg. Co.* v. *Bair, supra.* The principal issue in that case was whether the single-factor sales formula used by Iowa to apportion for income tax purposes the income of an interstate business was prohibited by either the Due Process Clause or the Commerce Clause. In the course of that decision we noted that "[a]ppellant does not suggest that it has shown that a significant portion of the income attributed to Iowa in fact was gen-

erated by its Illinois operations; the record does not contain any separate accounting analysis showing what portion of appellant's profits was attributable to sales, to manufacturing, or to any other phase of the company's operations." 437 U. S., at 272. See also *id.*, at 275, n. 9. Exxon contends that *Moorman* sanctions the use of separate functional accounting in order to prove the extraterritorial reach of a state tax statute, and that its accounting in this case demonstrates that the Wisconsin Supreme Court's application of the state apportionment statute violates the Due Process Clause.

We cannot agree. As this Court has on several occasions recognized, a company's internal accounting techniques are not binding on a State for tax purposes. For example, in *Butler Bros.* v. *McColgan, supra,* an interstate business challenged the application of the California apportionment statute. The company was engaged in the wholesale dry goods and general merchandise business as a middleman, and it had distributing houses in seven States, including one in California. Each house maintained stocks of goods, had a cognizable territory, had its own sales force, did its own solicitation of sales, made its own credit and collection arrangements, and kept its own books. There was, however, a central buying division that was able to purchase goods for resale at a lower price. The company used "recognized accounting principles," 315 U. S., at 505, to allocate all costs and charges to each house, with certain centralized expenses allocated among the houses. Based on that "separate accounting system," *id.,* at 507, the business asserted there was no net income in California.

We concluded that California could constitutionally apply its apportionment formula to the company's total net income to establish taxable income, rather than being limited to the income shown by the taxpayer's accounting methods to be attributable to the one house in that State. The company had the "distinct burden of showing by 'clear and cogent evidence' that it results in extraterritorial values being taxed,"

*ibid.*, quoting *Norfolk & Western R. Co.* v. *North Carolina ex rel. Maxwell,* 297 U. S. 682, 688 (1936), and the taxpayer's accounting evidence was insufficient to meet that burden.

"[W]e need not impeach the integrity of that accounting system to say that it does not prove appellant's assertion that extraterritorial values are being taxed. Accounting practices for income statements may vary considerably according to the problem at hand. . . . A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders. . . . That may be due to the fact, as stated by Mr. Justice Brandeis in *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 121, that a State in attempting to place upon a business extending into several States 'its fair share of the burden of taxation' is 'faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders.' Furthermore, the particular system used may not reveal the facts basic to the State's determination. *Bass, Ratcliff & Gretton, Ltd.* v. *Tax Commission, supra,* p. 283. In either aspect of the matter, the results of the accounting system employed by appellant do not impeach the validity or propriety of the formula which California has applied here." 315 U. S., at 507–508.

Similarly, in *Mobil Oil Corp.* v. *Commissioner of Taxes,* we noted that "separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale." 445 U. S., at 438. Since such factors arise "from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable 'source.' Although separate geographical

accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required." *Ibid.*[7]

The dicta in *Moorman* upon which appellant relies are not incompatible with these principles. In *Moorman* we simply noted that the taxpayer had made no showing that its Illinois operations were responsible for profits from sales in Iowa. This hardly leads to the conclusion, urged by Exxon here, that a taxpayer's separate functional accounting, if it purports to separate out income from various aspects of the business, must be accepted as a matter of constitutional law for state tax purposes. Such evidence may be helpful, but *Moorman* in no sense renders such accounting conclusive.[8]

The "linchpin of apportionability" for state income taxation of an interstate enterprise is the "unitary-business principle." *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 439. If a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a "rough approximation" of the corporate income that is "reasonably related to the activities conducted within the taxing State." *Moorman Mfg. Co.* v. *Bair,* 437 U. S., at 273. See also *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S., at 120. In order to exclude certain income from the apportionment formula, the company must prove that "the income was earned in the course of activities unrelated to the sale of petroleum products in that State." *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 439. The court looks to the "underlying economic realities of a

---

[7] The fact that Exxon in the present case relies on its own separate *functional* accounting rather than separate *geographic* accounting, which it had used initially in preparing its Wisconsin income tax returns, does not make the principles expressed in *Mobil Oil Corp.* v. *Commissioner of Taxes* any less applicable.

[8] In reaching this conclusion we need not challenge the integrity of Exxon's separate functional accounting for its own internal purposes. See *Butler Bros* v. *McColgan,* 315 U. S. 501, 507 (1942).

unitary business," and the income must derive from "unrelated business activity" which constitutes a "discrete business enterprise," 445 U. S., at 441, 442, 439.

We agree with the Wisconsin Supreme Court that Exxon is such a unitary business and that Exxon has not carried its burden of showing that its functional departments are "discrete business enterprises" whose income is beyond the apportionment statute of the State. While Exxon may treat its operational departments as independent profit centers, it is nonetheless true that this case involves a highly integrated business which benefits from an umbrella of centralized management and controlled interaction.

As has already been noted, Exxon's Coordination and Services Management provided many essential corporate services for the entire company, including the coordination of the refining and other operational functions "to obtain an optimum short range operating program." App. 189. Many of the items sold by appellant in Wisconsin were obtained through a centralized purchasing office in Houston whose obvious purpose was to increase overall corporate profits through bulk purchases and efficient allocation of supplies among retailers. Cf. *Butler Bros.* v. *McColgan,* 315 U. S., at 508 ("the operation of the central buying division alone demonstrates that functionally the various branches are closely integrated"). Even the gasoline sold in Wisconsin was available only because of an exchange agreement with another company arranged by the Supply Department, part of Coordination and Services Management, and the Refining Department. Similarly, sales were facilitated through the use of a uniform credit card system, uniform packaging, brand names, and promotional displays, all run from the national headquarters.

The important link among the three main operating departments of appellant was stated most clearly in the

testimony of an Exxon senior vice president. This official testified:

"[I]n any industry which is highly capital intensive, such as the petroleum industry, the fixed operating costs are highly relative to total operating costs, and for this reason the profitability of such an industry is very sensitive and directly related to the full utilization of the capacity of the facilities.

"So, in the case of the petroleum industry it is—where you have high capital investments in refineries, the existence of an assured supply of raw materials and crude is important and the assured and stable outlet for products is important, and therefore when there are—when these segments are under a single corporate entity, it provides for some assurance that the risk of disruptions in refining operations are minimized due to supply and demand imbalances that may occur from time to time.

.        .        .        .        .

"[T]he placing individual segments under one corporate entity does provide greater profits stability for the reason that . . . nonparallel and nonmutual economic factors which may affect one department may be offset by the factors existing in another department." App. 224–225.

The evidence fully supports the conclusion of the court below that appellant's marketing operation in Wisconsin is an integral part of a unitary business. Exxon's use of separate functional accounting, and its decision for purposes of corporate accountability to assign wholesale market values to interdepartmental transfers of products and supplies, does not defeat the clear and sufficient nexus between appellant's interstate activities and the taxing State.

The same analysis disposes of the other prong of Exxon's Due Process Clause attack on the Wisconsin statute. Appellant contends that at least the income derived from explora-

tion and production must be treated as situs income and allocated to the situs State rather than included in the apportionment statute.[9] Appellee did in fact exclude that income derived from the sale of crude oil and gas at the wellhead to third parties. However, the Department of Revenue concluded that the income characterized through appellant's separate functional accounting as income derived from intracorporate transfer of crude oil and gas for refining was part of the "unitary stream" of Exxon's income and apportionable.

We agree with appellee. As previously noted, appellant's internal accounting system is not binding on the State for tax purposes. The decision to assign wholesale market values to internal transfers of raw materials for corporate accountability does not change the unitary nature of appellant's business. An effective marketing operation is important to assure full or nearly full use of the refining capacities. Obviously the quality of the refined product affects the marketing operation. And the success of the Exploration and Production Department helps to keep the refineries operating at a capacity which is cost-efficient. There is indeed a unitary stream of income, of which the income derived from internal transfers of raw materials from exploration and production to refining is a part.[10] There is a sufficient nexus to satisfy the Due Process Clause.

There is also the necessary "rational relationship" between the income attributed to the State by the apportionment for-

---

[9] Exxon also appears to suggest that the state statute requires allocation to the situs State of such income rather than apportionment. See Brief for Appellant 31–32, 40–41. That, of course, is a matter of state statutory construction which the Wisconsin Supreme Court, as the final arbiter of that State's law, has decided against appellant.

[10] Since appellee determined that income derived from the sale of crude oil and gas at the wellhead to third parties must, under the state statute, be allocated to the situs State and excluded from the reach of the apportionment statute, we need not address the issue of whether the Due Process Clause would require such allocation rather than apportionment.

mula and the intrastate value of the business. Exxon had a total of $60,073,293 in sales income from its Wisconsin operation in the years 1965 through 1968. App. 799. The Wisconsin assessed taxable income for the four years in question represented 0.22 percent of total company net income adjusted to the Wisconsin basis, and Exxon's Wisconsin sales for those years represented 0.41 percent of total company sales. 90 Wis. 2d, at 729, 281 N. W. 2d, at 110. This is hardly a case where the State has used its formula to attribute income "out of all appropriate proportion to the business transacted . . . in that State," *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell,* 283 U. S., at 135, and application of the formula has not "led to a grossly distorted result," *Norfolk & Western R. Co.* v. *State Tax Comm'n,* 390 U. S., at 326. See also *Moorman Mfg. Co.* v. *Bair,* 437 U. S., at 274. That Exxon's Wisconsin marketing operation, through the use of separate geographic accounting, failed to show a net profit for the years in question does not change this rational relationship. *Butler Bros.* v. *McColgan,* 315 U. S., at 507–508; *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S., at 284. Cf. *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S., at 120. The Wisconsin Supreme Court's application of Wis. Stat. §§ 71.07 (1) and (2) (1967) in this case does not violate the Due Process Clause of the Fourteenth Amendment.

### III

Appellant also contends that the Commerce Clause requires allocation of all income derived from its exploration and production function to the situs State rather than inclusion of such income in the apportionment formula.[11] The Court must therefore examine the "practical effect" of the tax to

---

[11] Because of appellee's construction of the state statute involved, we do not here address the issue of whether the Commerce Clause requires allocation of income derived from the sale of crude oil and gas at the wellhead to third parties to the situs State rather than apportionment.

determine whether it " 'is applied to an activity with a sub-stantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' " *Mobil Oil Corp.* v. *Commissioner of Taxes*, 445 U. S., at 443, quoting *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279 (1977). See also *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 444–445 (1979); *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 750 (1978).

It has already been demonstrated that the necessary nexus is present and that the tax is fairly apportioned. Similarly, appellant does not contest the conclusion that the tax is fairly related to the services rendered by Wisconsin, which include police and fire protection, the benefit of a trained work force, and "the advantages of a civilized society." *Japan Line, Ltd.* v. *County of Los Angeles, supra,* at 445. Exxon asserts, however, that Wisconsin's taxing statute, as applied, subjects interstate business to an unfair burden of multiple taxation.

We were faced with a very similar argument in *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* and we reject it now for the same reasons we rejected it in that case. Here, as in that prior case, the State seeks to tax income, not property ownership. Similarly, it is the *risk* of multiple taxation that is being asserted; actual multiple taxation has not been shown.[12] While of course "the constitutionality of a [Wiscon-

---

[12] Appellant presses the argument here that the *risk* of multiple taxation of income violates the Commerce Clause. Brief for Appellant 46–48; Reply Brief for Appellant 15–18; Supplemental Brief for Appellant 8. There was testimony by one witness before the Tax Appeals Commission that some States imposed "severance taxes" on oil and gas production. App. 432. Based on this brief testimony, the Tax Appeals Commission concluded that application of the state apportionment formula to Exxon's net income from its exploration, production, and refining functions subjected that income to multiple taxation, CCH Wis. Tax Rep. ¶ 201–223, p. 10,410 (1976), and the Circuit Court for Dane County reached a similar result solely as to the exploration and production income, CCH Wis. Tax Rep. ¶ 201–373, p. 10,503 (1977). Severance taxes, however, are directed

sin] tax should not depend on the vagaries of [another State's] tax policy," nonetheless "the absence of any existing duplicative tax does alter the nature of appellant's claim." *Id.*, at 444. Exxon asserts, in essence, that the Commerce Clause requires allocation of exploration and production income to the situs State rather than apportionment among the States, regardless of the situs State's actual tax policy. Cf. *ibid.* (dividend income).

We do not agree. As was the case with income from intangibles, there is nothing "talismanic" about the concept of situs for income from exploration and production of crude oil and gas. *Id.*, at 445. Presumably, the States in which appellant's crude oil and gas production is located are permitted to tax in some manner the income derived from that production, there being an obvious nexus between the taxpayer and those States. However, "there is no reason in theory why that power should be exclusive when the [exploration and production income as distinguished through separate functional accounting] reflect[s] income from a unitary business, part of which is conducted in other States. In that situation, the income bears relation to benefits and privileges conferred by several States. These are the circumstances in which apportionment is ordinarily the accepted method." *Id.*, at 445–446.

In short, the Commerce Clause does not require that any income which a taxpayer is able to separate through account-

---

at the gross value of the mineral extracted or the quantity of production rather than the net income derived from the production activities. See R. Sullivan, Handbook of Oil and Gas Law § 238, p. 490 (1955); 4 W. Summers, The Law of Oil and Gas § 801 (1938). See, *e. g.*, La. Rev. Stat. Ann. §§ 47:633 (7) and (9) (West Supp. 1980). The Wisconsin Supreme Court therefore properly concluded that "[t]he fact that the producing states may impose . . . severance taxes which have been held to be occupation taxes or property taxes does not render unfair or unconstitutional Wisconsin's efforts to reach a proportionate share of the taxpayer's income." 90 Wis. 2d, at 731, 281 N. W. 2d, at 110–111 (footnotes omitted).

ing methods and attribute to exploration and production of crude oil and gas be allocated to the States in which those production centers are located. The geographic location of such raw materials does not alter the fact that such income is part of the unitary business of the interstate enterprise and is subject to fair apportionment among all States to which there is a sufficient nexus with the interstate activities of the business.

The judgment of the Supreme Court of Wisconsin is

*Affirmed.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.