In the Matter of the INCOME TAX PRO-
TEST OF GRIFFIN TELEVISION, INC.
and Subsidiaries.

GRIFFIN TELEVISION, INC., Appellant,

v.

STATE of Oklahoma ex rel.,
OKLAHOMA TAX COM-
MISSION, Appellee.

No. 79663.

Supreme Court of Oklahoma.

April 5, 1994.

Rehearing Denied July 25, 1994.

Kornfeld, Franklin, Renegar, & Randall by Julian P. Kornfeld, Tom M. Moore, Oklahoma City, for appellant.

Oklahoma Tax Commission by David Hudson, J.L. Miller, Oklahoma City, for appellee.

HODGES, Chief Justice.

This is an appeal from a ruling of the Oklahoma Tax Commission (Commission) denying a protest of a proposed assessment of taxpayer, Griffin Television, Inc. and its subsidiaries (Taxpayer). The issues before this Court are whether the assessment is barred by the statute of limitations pursuant to Okla.Stat. tit. 68, § 223(a) (1981), and, if not, whether the gain from the sale of the property in Arkansas should be apportioned between Arkansas and Oklahoma or should be allocated to Arkansas.

I. FACTS

The facts of the protest were stipulated by the parties and adopted by the Administrative Law Judge and the Commission. All the stipulated facts are for the tax periods for the fiscal years 1985 and 1986, the years for which the proposed assessments were issued.

Griffin Grocery Company (Griffin Grocery) was a wholly-owned subsidiary of Griffin Television, Inc. Griffin Grocery was composed of two divisions: Griffin Manufacturing and Van Buren Wholesale. For the tax years 1985 and 1986, Taxpayer reported the income and loss of Van Buren Wholesale as allocable 100% to Arkansas. The Commission proposed an additional assessment pursuant to Okla.Stat. tit. 68, § 221 (1981), contending that Griffin Grocery and its two divisions were a unitary business and the income from Van Buren Wholesale should be apportioned between Oklahoma and Arkansas.

Taxpayer's Oklahoma income tax return for the fiscal year, ending June 30, 1985, was filed with the Commission on September 17, 1985, and the return for the fiscal year, ending June 30, 1986, was filed on October 9, 1986. By letters dated July 22, 1988, the Commission notified Taxpayer that it owed additional taxes and interest of $41,410.00 for the fiscal year 1985 and $42,047.00 for the fiscal year 1986. Taxpayer filed a protest within the statutory time.

Taxpayer asserts that an assessment for the purposes of title 68, section 223(a), was never levied, and the limitation period for levying additional taxes has passed. It further asserts that pursuant to title 68, sections 2358(A)(4)(a) and (c) and 2358(A)(5), all of the income from Van Buren Wholesale should be allocated to Arkansas. The Commission counters that the proposed assessment letters were issued within the three-year limitation period and constitute an "assessment" within the meaning of section 223(a). The Commission further argues that the income from Van Buren Wholesale should be apportioned between Oklahoma and Arkansas because the operations of Griffin Grocery and its two divisions were a unitary enterprise.

II. TIME LIMITATION

■ The applicable limitations period is stated in Section 223(a) of title 68 which provides:

No assessment of any tax levied under the provisions of any state tax law except as provided in the following paragraphs of this Section, shall be made after the expi-

ration of three (3) years from the date the return was required to be filed or the date the return was filed, whichever period expires the later, and no proceedings by tax warrant or in court without the previous assessment for the collection of such tax shall be begun after the expiration of such period.

The proposed assessment was issued pursuant to section 221 of title 68 which provides:

(a) If any taxpayer shall fail to make any report or return as required by any state tax law, the Tax Commission, from any information in its possession or obtainable by it, may determine the correct amount of tax for the taxable period. If a report or return has been filed, the Tax Commission shall examine such report or return and make such audit or investigation as it may deem necessary.... [I]f, in cases where a report or return has been filed, the Tax Commission shall determine that the tax disclosed by such report or return is less than the tax disclosed by its examination, it shall in writing propose the assessment of taxes or additional taxes, as the case may be, and shall mail a copy of the proposed assessment to the taxpayer at his last known address.

While the proposed assessment is not the same as a final assessment for purposes of section 223(a), the issuance of the proposed assessment pursuant to section 221 does toll the three-year limitation period.

In *Protest of Pentecost & Hodges, Inc.*, 186 Okla. 390, 98 P.2d 606 (1940), the taxpayer filed a return on June 15, 1935. On June 4, 1937, the Commission issued a proposed assessment and, on June 25, 1937, issued an amended proposed assessment. At the time the amended proposed assessment had been issued, more than two years had passed since the return was filed and the Commission had not issued an order finalizing the amount of tax. The applicable statute of limitations provided "that the amount of tax levied by any provision of the Act shall be assessed within two years after the return is filed." Okla.Stat. ch. 66, art. 14, § 12498z1(d) (Supp. 1934).

The taxpayer argued that the statute of limitations barred the assessment. Rejecting the taxpayer's argument, this Court held that the statute of limitations did not bar the assessment. *Pentecost*, 98 P.2d at 609. Since the protest time had not run and the Commission had not issued an order finalizing the amount of tax within the two-year statutory period, it follows that the proposed assessment tolled the statute of limitations.

This Court addressed this same issue in *In re Woods Corp.*, 531 P.2d 1381 (Okla.1975). In July of 1969, Woods purchased an airplane in California which was delivered in Montana and flown to and used in Oklahoma. Woods did not pay any sales or use tax on the plane. On May 22, 1970, the Commission issued a proposed assessment for use tax. On June 19, 1970, Woods filed a protest. On November 1, 1973, the Commission entered an order denying the protest.

Woods argued that the statute of limitations had run because the order denying the protest had not been entered within the three-year statute of limitations. This Court held that "the filing of [a] proposed assessment tolls [the] statute of limitations." *Id.* at 1386.

As evidenced by these cases, the rule in Oklahoma is that the filing of a proposed assessment tolls the statute of limitations. This rule is in keeping with the Legislature's intent. The first pronouncement of this rule came in 1940 in *Pentecost.* In 1965, the Oklahoma Legislature enacted the Oklahoma Tax Code, including section 223 of title 68 which is the statute of limitations for assessing state taxes. In the 1965 enactment, the Legislature chose to leave the rule announced in *Pentecost* intact.

In *Lekan v. P & L Fire Protection Co.*, 609 P.23 1289, 1292 (Okla.1980), this Court stated:

Legislative familiarity with extant judicial construction of statutes in the process of being amended is presumed. Unless a contrary intent clearly appears or is plainly expressed, the terms of amendatory acts which retain the same, or not substantially dissimilar, portions of provisions formerly in force will be accorded the construction

identical to that placed upon them by preexisting case law.

Because the Legislature left untouched this Court's construction of the statute of limitations allowing the proposed assessment to toll its running, this Court must presume that the Legislature acquiesced in this Court's announcement.

## III. ALLOCATION OF INCOME

The Commission argues that the income from the sale of Van Buren Wholesale should be apportioned between Oklahoma and Arkansas pursuant to section 2358(A)(5) of title 68 because Griffin Grocery and its subsidiaries constituted a unitary business. Taxpayer argues that the income should be allocated to Arkansas pursuant to section 2358(A)(4)(a) and (c) because Van Buren Wholesale was a discrete business operation separate from Griffin Grocery and Griffin Manufacturing.

■ Taxpayer bases its argument, in part, on section 2358(A)(4)(a) which provides: "Income from real and tangible personal property ... and gains or losses from sales of such property, shall be allocated in accordance with the situs of such property." Because Van Buren Wholesale was a subsidiary of Griffin Grocery, the capital gains realized by Griffin Grocery on the sale of Van Buren Wholesale were gains on the sale of stock which was intangible property. *See Allied–Signal, Inc. v. Director, Division of Taxation,* ── U.S. ──, ──, 112 S.Ct. 2251, 2259, 119 L.Ed.2d 533 (1992); *ASARCO, Inc. v. Idaho State Tax Commission,* 458 U.S. 307, 309, 102 S.Ct. 3103, 3105, 73 L.Ed.2d 787 (1982). Because section 2358(A)(4)(a) addresses only real and tangible property, it is not applicable here.

■ Taxpayer also relies on section 2358(A)(4)(c) which provides: "Net income or loss from a business activity which is not a part of business carried on within or without the state of a unitary character shall be separately allocated to the state in which such activity is conducted." Section 2358(A)(5) provides that net income or loss derived from a unitary business enterprise shall be taxed under an apportionment formula. In this case if the property is real or tangible personal property or is not derived

from a unitary business activity carried on in Oklahoma and Arkansas, Oklahoma will not realize any of the taxes from income resulting from the sale of Van Buren Wholesale. However, if the income was derived from a unitary business activity carried on in both Oklahoma and Arkansas, the taxes from the sale should be apportioned between Oklahoma and Arkansas.

■ The Due Process and Commerce Clauses of the United States Constitution generally prohibit a state from taxing income earned outside its borders. *Allied–Signal, Inc.,* ── U.S. at ──, 112 S.Ct. at 2258. Due process requires that, when a state attempts to tax income earned in another state, it must show that the "taxing power exerted by [it] bears [a] fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267 (1940). If there is "a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise," then the due process limitations are satisfied. *Mobil Oil Corp. v. Commissioner of Taxes of Vermont,* 445 U.S. 425, 436–37, 100 S.Ct. 1223, 1231–32, 63 L.Ed.2d 510 (1980) citing *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 272–73, 98 S.Ct. 2340, 2343–45, 57 L.Ed.2d 197 (1978). This "minimal connection" requirement is fulfilled "so long as the intrastate and the extrastate activities formed part of single unitary business." *Mobil Oil Corp.,* 445 U.S. at 438, 100 S.Ct. at 1232.

> "The unitary business rule is a recognition of two imperatives: the States' wide authority to devise formulae for an accurate assessment of a corporation's intrastate value or income; and the necessary limit on the States' authority to tax value or income which cannot in fairness be attributed to the taxpayer's activities within the State."

*Allied–Signal,* ── U.S. at ──, 112 S.Ct. at 2259. If the business activities are of a

unitary nature, the due process clause allows a state to apportion a taxpayer's total income, that is income from both within and without a state's boundaries, to determine the part of the total income derived from activities in the state. *Exxon Corp. v. Department of Revenue of Wisconsin,* 447 U.S. 207, 223, 100 S.Ct. 2109, 2120, 65 L.Ed.2d 66 (1980).

In *In re Income Tax Protest of Ashland Exploration, Inc.,* 751 P.2d 1070, 1072 (Okla. 1988), this Court stated the test for determining when a business was unitary in nature as follows:

A business that operates in more than one state is a "unitary business" for income tax purposes when operations conducted in one state benefit and are benefited by operations in one or more other states where the various aspects are so interdependent and of such mutual benefit that they are considered to form one integral business.

Three factors are to be considered in applying this test: "(1) functional integration; (2) centralization of management; and (3) economies of scale." *Allied–Signal,* —— U.S. ——, ——, 112 S.Ct. 2251, 2260, 119 L.Ed.2d 533 (1992).

The United States Supreme Court addressed the issue of whether Idaho could tax income earned outside its boundaries in *ASARCO,* 458 U.S. at 322–24, 102 S.Ct. at 3112–13. Idaho State Tax Commission attempted to tax dividends paid to ASARCO by Southern Peru. ASARCO owned a majority interest in Southern Peru. ASARCO's primary business in Idaho was the operation of a silver mine. Southern Peru produced "blister copper" in Peru, 20–30% of which it sold to Southern Peru Copper Sales Corporation in which ASARCO also owned a majority interest. About 35% of Southern Peru's output was sold to ASARCO at trade prices. Neither Southern Peru nor ASARCO controlled the prices. ASARCO had a controlling interest in Southern Peru but did not assert control. "ASARCO did not 'control Southern Peru in any sense of that term'" and did not give direction or approval ·to Southern Peru on major decisions. The Court concluded "that ASARCO's Idaho sil-

ver mining and Southern Peru's autonomous business [were] insufficiently connected to permit the two companies to be classified as a unitary business." *Id.* at 322.

Also in *ASARCO,* the Idaho Tax Commission attempted to tax dividends paid to AS-ARCO by M.I.M. Holdings. ASARCO owned 52% of M.I.M.'s stock. M.I.M. engaged "in the mining, milling, smelting, and refining of copper, lead, zinc, and silver in Australia" and "operate[d] a lead and zinc refinery in England." *Id.* About 1% of M.I.M.'s output was sold to ASARCO at open market prices. M.I.M. was staffed and operated by Australian people. ASARCO did not manage M.I.M. even though it could have done so. The companies did not have any common director or officers. The Court determined that, because "the business relation [was] nominal, it [was] clear that M.I.M. [was] merely an investment" and not part of ASARCO's Idaho silver mining operation.

In *F.W. Woolworth Co. v. Taxation and Revenue Dep't of New Mexico,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982), New Mexico attempted to tax dividends paid to Woolworth by foreign subsidiaries. In considering the "functional integration, centralization of management, and economies of scale," the Court found that the subsidiaries's operations were not interrelated with the parent company. *Id.* at 370.

In addressing the functional integration of the parent company and the foreign subsidiaries, the Court noted that "*no* phase of any subsidiary's business was integrated with the parent's"; each subsidiary made its own decisions concerning merchandise, store location, advertising and accounting independent of the parent company; each subsidiary had its own accounting department, financial staff, and legal staff; there was "no centralized purchasing, manufacturing, or warehousing of merchandise"; there was no centralized personal training program; and "each subsidiary was responsible for obtaining its own financing from sources other than the parent." The Court concluded that the operations were not functionally integrated. *Id.* at 365–66, 102 S.Ct. at 3135–36.

In addressing "centralization of management and achievement of other economies of

scale," the Court noted that "each subsidiary operated as a distinct business enterprise at the level of full time management"; at most one officer of one of the subsidiaries was also an officer of the parent company; "[t]here was no exchange of personnel"; each subsidiary trained its own managers; and each subsidiary made its own policies. On the other hand, the parent company and some of the subsidiaries had several common directors; there was frequent communication between the upper management of the subsidiaries and the parent; and "the amount of dividends to be paid by the subsidiaries and the creation of substantial debt ... had to be approved by the parent." *Id.* at 366–69, 102 S.Ct. at 3136–38.

The Court also noted that "the parent company's operations [were] not interrelated with those of its subsidiaries so that one's 'stable' operation is important to the other's 'full utilization' of capacity." *Id.* at 370, 102 S.Ct. at 3138. There was no centralization of purchasing and services with the intent to increase profits through economies of scale. In reviewing these facts, the Court concluded that there was no unitary operation which would allow New Mexico to apportion taxes from the foreign corporations.

Turning now to the present case, based on functional integration, centralization of management, and economies of scale, Griffin Grocery, Griffin Manufacturing, and Van Buren Wholesale were not a unitary operation. Griffin Grocery's corporate headquarters were located in Muskogee, Oklahoma, and its legal counsel was located in Oklahoma City. Griffin Manufacturing was a food manufacturer with all of its plant, facilities, and administrative offices located in Muskogee, Oklahoma. Griffin Manufacturing produced and sold food items.

Van Buren Wholesale was a wholesale food distributor with all of its real and personal property located in Van Buren, Arkansas. All of Van Buren Wholesale's products were sold to supermarkets. All of Van Buren Wholesale's employees lived in Arkansas. None of the employees of Van Buren Wholesale worked for Griffin Manufacturing, and none of Griffin Manufacturing's employees worked for Van Buren Wholesale. The hiring, firing and salary decisions for employees of Van Buren Wholesale were all made by management personnel of Van Buren Wholesale.

Van Buren Wholesale had seven or eight sales persons who serviced its customers. All of the sales persons resided in the Van Buren, Arkansas area. None of the sales persons for Van Buren Wholesale sold any products for Griffin Manufacturing. Griffin Manufacturing had its own sales people, none of whom sold for Van Buren Wholesale.

Van Buren Wholesale purchased less than one per cent of its inventory from Griffin Manufacturing. These purchases were treated the same as purchases from other suppliers. Griffin Manufacturing treated sales to Van Buren Wholesale as it did sales to other customers.

Van Buren Wholesale prepared invoices for the sale of its merchandise in Van Buren, Arkansas. Only Van Buren Wholesale's employees prepared purchase orders for Van Buren Wholesale. The purchase orders were printed in Van Buren Wholesale's offices. No one in Muskogee, Oklahoma, had anything to do with the purchase of merchandise or inventory by Van Buren Wholesale nor did anyone in Muskogee have to approve the purchases.

The executive vice-president and general manager of Van Buren Wholesale, Harold McDowell, lived in Van Buren, Arkansas. He traveled to Oklahoma only once or twice a year to review Van Buren Wholesale's budget.

Van Buren Wholesale's decisions on extending credit were done exclusively by personnel in its office. Van Buren Wholesale paid its suppliers through a bank account in Van Buren, Arkansas. Although Van Buren Wholesale's employees prepared the checks to pay bills and invoices, the checks were written on a Muskogee bank. None of Griffin Manufacturing's bills were paid on or through bank accounts of Van Buren Wholesale. Van Buren Wholesale maintained separate accounting books and records.

Griffin Manufacturing and Van Buren Wholesale had no common employees or officers except William A. Buckley who was

Executive Vice President of Griffin Grocery and President of Van Buren Wholesale but took no part in the management of Griffin Manufacturing. No officer of Van Buren Wholesale, with the exception of William A. Buckley, officed, lived or spent any substantial amount of time in Muskogee, Oklahoma.

Until his death on July 27, 1985, John T. Griffin, a Muskogee resident, was the President and Chief Executive Officer of both Griffin Television and Griffin Grocery Company. John T. Griffin had the authority to override decisions of the management of both Griffin Manufacturing and Van Buren Wholesale. However, neither John T. Griffin nor the Board of Directors of Griffin Grocery Company exercised control over the day-to-day operations of Griffin Manufacturing or Van Buren Wholesale.

The only administrative service provided by Griffin Grocery to Van Buren Wholesale was the issuing of payroll checks. Van Buren Wholesale paid Griffin Grocery a fee for this service.

Griffin Grocery sold all of Van Buren Wholesale's assets in the fiscal year ending June 30, 1986. Only one employee of Van Buren Wholesale, Harold McDowell, was offered a position with Griffin Grocery or Griffin Manufacturing. He was offered employment by Griffin Grocery, as an employee and consultant on an "as needed" basis.

The Commission recites several allegations which they contend support its position. The stipulated facts which the Commission references favoring its view are "John Griffin, as President and Chief Executive Officer of Griffin Grocery Company, had the authority to override decision of the management of either Griffin Manufacturing or Van Buren Wholesale." As noted in *ASARCO* and *F.W. Woolworth*, "the *potential* to operate a company as part of a unitary business is not dispositive...." *F.W. Woolworth*, 458 U.S. at 362, 102 S.Ct. at 3134; *ASARCO*, 458 U.S. at 322–23, 102 S.Ct. at 3112–13.

The Commission also relies on several other facts, including the fact that the employees of Griffin Manufacturing and Van Buren Wholesale were employees of Griffin Grocery. Given that the businesses were sepa-

rate in almost all other respects, these few factors do not change the character of the operations. Like in *F.W. Woolworth*, 458 U.S. at 369, 102 S.Ct. at 3137, "[e]xcept for the occasional oversight ... that any parent gives to an investment in a subsidiary, there is little or no integration of the business activities or centralization of the management" of the parent and the subsidiaries. Van Buren Wholesale is a separate operation from Griffin Grocery and Griffin Manufacturing, and there is no centralized management or control. The Commission is attempting to tax income which was not derived from a unitary operation in violation of the Due Process Clause and section 2358(A)(4)(c) of title 68 of the Oklahoma Statutes. The gain from the sale of Van Buren Wholesale was allocable entirely to the State of Arkansas and should not be apportioned between the states of Oklahoma and Arkansas.

The Commission's order denying the refund is reversed, and the cause is remanded with instructions to refund the protested taxes.

ORDER OF TAX COMMISSION REVERSED. CAUSE REMANDED WITH INSTRUCTIONS TO REFUND THE PROTESTED TAXES.

LAVENDER, V.C.J., and OPALA, ALMA WILSON and WATT, JJ., concur.

KAUGER, J., concurs in result.

SIMMS and HARGRAVE, JJ., concur in part, dissent in part.

SIMMS, Justice, concurring in part, dissenting in part:

Two issues are before this Court. The first is whether the "proposed assessment" sent by the Oklahoma Tax Commission (OTC) to Griffin Television, Inc. and its subsidiaries (collectively "Griffin"), constituted an "assessment" under 68 O.S.1981, § 223 so as to meet the statute of limitations on tax assessments. Because I believe the "proposed assessment" does not constitute an "assessment" under § 223, I must respectfully dissent to Part II of the majority opinion.

However, I believe the majority has correctly determined the second issue regarding

the apportionment between Oklahoma and Arkansas of the gain that Griffin received on the sale of property in Arkansas. Consequently, I concur in Part III of the opinion and agree that the order imposing additional assessment should be reversed.

The relevant statute, 68 O.S.1981, § 223, provides, in pertinent part:

"(a) *No assessment* of any tax levied under the provisions of any state tax law except as provided in the following paragraphs of this Section, *shall be made after the expiration of three (3) years from the date the return was required to be filed or the date the return was filed, whichever period expires the later,* and no proceedings by tax warrant or in court without the *previous assessment* for the collection of such tax shall be begun after the expiration of such period." (Emphasis added).

The statute clearly grants a three-year period within which an "assessment" must be made. Griffin received the proposed assessment two months before the statutory period ran, but an actual assessment of taxes did not occur until long after the period expired. The proposed assessment informs Griffin that a field audit of its 1985 and 1986 Corporation Income Tax Returns "discloses additional tax and interest due" in a stated amount. It concludes with the following paragraph:

"In the event you do not agree with this *proposed assessment or adjustment,* you may within thirty days file a verified protest with the Commission and, if requested therein, a hearing will be granted before the Commission. In the event you do not do so, this *assessment or adjustment will become final,* at the expiration of said thirty days and payment must be made at that time." (Emphasis added).

By its very terms, the proposed assessment indicates that it is not a final assessment. Rather, it will become final upon the happening of a certain event, to wit, Griffin's failure to protest. Because Griffin timely protested the proposed assessment and requested a hearing, the proposed assessment *did not become final.*

The majority ignores the § 223 requirement that all tax assessments be made within three years of the date that the return was required to be filed or was actually filed. Instead, the majority concludes that the mailing of a notice of proposed assessment tolls the statute of limitations. Such a conclusion contradicts both the unambiguous language and the legislative intent of § 223.

Section 223 was part of the Uniform Tax Procedure Act enacted by the Oklahoma Legislature in 1965. *See* 1965 Okla.Sess. Laws, ch. 414, § 2. Another part of that act is 68 O.S.1981, § 221 which authorizes OTC to send a letter proposing an additional assessment. Indeed, the language used by OTC in its proposed assessment sent to Griffin was clearly lifted from § 221.

Section 221(a) provides that where OTC determines from its investigation that additional taxes may be due, "it shall in writing propose the assessment of taxes or additional taxes, as the case may be, and shall mail a copy of the proposed assessment to the taxpayer at his last-known address." The statute then grants the taxpayer the right to file a protest "[w]ithin thirty (30) days after the mailing of the aforesaid proposed assessment." 68 O.S. 1981, § 221(c). Subsection (d) permits the taxpayer to request an oral hearing on the protest. The statute then states that if the taxpayer fails to timely file a written protest, "then the proposed assessment, without further action of the Tax Commission, shall become final and absolute at the expiration of thirty (30) days from the date same is mailed to the taxpayer." 68 O.S.1981, § 221(e).

Throughout the statute, the legislature uses the terms "proposed assessment" to describe an assessment that has not been finalized. The language indicates that when a taxpayer protests the proposed assessment and requests a hearing as Griffin did herein the assessment does not become final until resolution of the protest. *See also* 68 O.S. Supp.1989, § 226(b) which provides an alternative to protesting the § 221 proposed assessment. Under § 226, the taxpayer may pay the taxes and give notice that they will bring suit against OTC for the recovery of those taxes. However, § 226(b) provides for

the assessment to become "final and absolute" if the taxpayer does not file the action within one year from the date of the mailing of the § 221 proposed assessment.

Moreover, if the taxpayer protests and a hearing is held, the assessment still does not become final unless the taxpayer fails to file an appeal of an adverse ruling within thirty days after a certified copy of the order is mailed to the taxpayer. 68 O.S.1981, § 221(g). It appears that the legislature intended to use the term "proposed" in § 221 for a specific reason and that a proposed assessment would not be final until certain events occur.

In § 223, however, the term "proposed" is never used. The statute unambiguously states that every *assessment* must be made within three years. Nowhere does it say that a "proposed assessment" may be made; nor do its terms allow for a "proposed assessment" to toll the statute of limitations. I am convinced that the legislature intended for the statute of limitations of § 223 to *apply to all assessments and that there is no legislative intent that a proposed assessment would toll the statute.* Otherwise, if the legislature intended for the term "assessment" used in § 223 to include "proposed assessment" then the legislature could, and should, have indicated such in the statute when it enacted the Uniform Tax Procedure Act in 1965. "[S]tatutes must be interpreted to render *every word* and sentence operative, rather than a manner which would render a specific statutory provision nugatory." *State ex rel. Thompson v. Ekberg,* 613 P.2d 466 (Okla. 1980); *TWA v. McKinley,* 749 P.2d 108 (Okla.1988) (Emphasis added). To treat a "proposed assessment" as an "assessment" would be to ignore both the specific term "proposed" which the legislature intentionally drafted into § 221, and the absolute requirement in § 223 that "no assessment . . . shall be made after the expiration of three (3) years" from the date of the return.

Rather than addressing the unambiguous use of the term "assessment" in § 223, the majority merely finds the statute of limitations is tolled by the § 221 proposed assessment, grounding its decision upon two cases. The first, *Protest of Pentecost & Hodges,*

*Inc.,* 186 Okla. 390, 98 P.2d 606 (1940), does not hold what the majority states as its holding. In *Pentecost,* the Oklahoma Tax Commission gave the taxpayer notice of a proposed additional assessment for income taxes. The notice was given within the then applicable two year statute of limitations. However, after the two year period expired, but within the time for taxpayer's protest, the Commission notified the taxpayer that the earlier proposed assessment had been canceled and an increased assessment proposed. The taxpayer *had not protested the earlier proposed assessment,* but lodged a protest against the second proposed assessment based upon the argument that the Commission had abandoned its first proposed additional assessment by adopting in its second proposal a wholly new plan or principle for determining the additional assessment. Taxpayer had not raised the defense of the statute of limitations in a timely fashion and the plea in bar had been disallowed at the close of the hearing. The Court found that even if the defense had been timely raised, it would not have availed the taxpayer, for even if the second proposal did present a plan or method unlike that in the first proposal, it would nonetheless be an amendment of the first notice. The Court stated:

> "both proposals related to the same income, and the last thereof can be considered in no other manner than a mere amendment of the first. The mere change in the process or plan of calculation cannot give to the last proposal the character of a new proceeding." 98 P.2d at 609.

Hence, *Pentecost* does not hold that a proposed assessment tolls the statute of limitations. It merely stands for the proposition that an amended proposed assessment lodged after the limitation period but before the time for protest had run stands in the place of an earlier proposed assessment made *prior* to the running of the statute. The Court did not address the issue of whether the original *proposed assessment* met the statute of limitations' requirement of an *assessment* within two years because the taxpayer did not raise that issue. Thus, this majority's reliance upon *Pentecost* is misplaced.

For the same reason, the majority's reliance upon *In re Woods Corp.*, 531 P.2d 1381 (Okla.1975) is likewise amiss. *Woods* concerned a protest to an additional assessment of use tax upon an airplane purchased by the corporation in 1969. Woods Corp. paid no sales tax or use tax for the airplane, and, well within the statutory time, the tax commission sent a proposed assessment pursuant to § 221 to Woods Corp. in May of 1970. Woods Corp. immediately protested the proposed assessment, also within the statutory period, but nothing more was done on the case until September of 1973, over three years later, when the tax commission notified Woods Corp. of a scheduled hearing on the protest. Arguing that the protest it filed was equivalent to a return required by law, Woods Corp. contended the assessment should be barred because no final assessment was made within three years of the filing of the "return"/protest. This Court rejected Woods Corp.'s argument, and citing *Pentecost, supra* in support, stated that the filing of the proposed assessment tolled the statute of limitations.

As noted above, the Court in *Pentecost* did not hold that a proposed assessment tolled the statute of limitations, and this Court erred in *Woods Corp.* by stating that it did. The case at bar provides this Court with the opportunity to correct that mistake and interpret §§ 221 and 223 according to the unambiguous legislative intent.

· The majority also indicates that by enacting the Oklahoma Tax Code including § 223 in 1965, "the Legislature chose to leave the rule announced in *Pentecost* intact." However, *Pentecost* does not directly or impliedly hold that proposed assessments toll the statute of limitations. *Pentecost* did not even address the issue. Therefore, contrary to the insistence of the majority, the Legislature did not have "extant judicial construction" of the statutes upon which to base a decision as to the enactment or amendment of the statute of limitations on tax assessments.

The decision of the majority fails to recognize and follow the legislative intent of § 223 and permits OTC to assess additional taxes upon taxpayers long after the statutory time

period for assessing such taxes has run. The decision places Oklahoma taxpayers in the position of not knowing with certainty what their tax liability is whereas taxpayers in other states know after a definite period that their tax liability has been determined. See *Weyenberg Shoe Mfg. Co. v. Kelley*, 210 Wis. 638, 246 N.W. 418 (1933) (holding that a proposed assessment is not a final assessment) and *Wilmington Trust Co. v. State Tax Comm'r*, 275 A.2d 568 (Del.1971) (holding that the statute of limitations for tax assessments is not met by a letter notifying the taxpayer of additional taxes but that actual assessment of those taxes must occur). I would hold that OTC's proposed assessment did not constitute an assessment and does not toll the statute of limitations found in 68 O.S.1981, § 223.

I am authorized to state that Justice HARGRAVE joins me in the views expressed above.