472 So.2d 497 (1985)
WESTERN ACCEPTANCE COMPANY, Appellant,
v.
STATE of Florida, DEPARTMENT OF REVENUE, Appellee.
No. AU-349.
District Court of Appeal of Florida, First District.
June 13, 1985.
Rehearing Denied July 30, 1985.
*499 David W. Roquemore, Jr. & Paul R. Linder of Gurney & Handley, Orlando, for appellant.
Jim Smith, Atty. Gen., Joseph C. Mellichamp, III, Asst. Atty. Gen., Larry Sartin, Asst. Gen. Counsel, Dept. of Revenue, Tallahassee, for appellee.
ERVIN, Chief Judge.
Western Acceptance Corporation (Acceptance), a foreign corporation, appeals a final order of the Department of Revenue (DOR), contending DOR erred in imposing corporate tax deficiencies and penalties against Acceptance. We disagree and affirm.
Acceptance, a Delaware corporation with its principal place of business in Kansas City, Kansas, which is not authorized to do business in Florida, is a wholly owned subsidiary of Western Auto Supply Company (Supply). Its role is to provide financing for various customer purchases in stores either owned by the parent corporation or by independently owned dealer stores. Acceptance owns no property other than cash and receivables, has no offices or employees in or out of Florida, and its officers carry on its day-to-day operations. Supply, the parent corporation, is authorized to do business in Florida, and does so through both dealer stores and company-owned stores.
The events that are pertinent to the issues raised in this appeal break down into two time periods: prior to December 1, 1973 and subsequent to November 30, 1973.

A. Procedure For Handling the Financing of Purchases at Dealer Stores in Florida Before December 1, 1973.
Before December 1, 1973, customers buying merchandise and services at dealer stores were able to finance such purchases on an installment payment plan by means of "dealer retail contracts" (DRCs). The procedure called for the customer and dealer to enter into a DRC and then for the dealer, at his option, to sell the DRC to Supply pursuant to a "purchase agreement" entered into between the dealer and Supply. Supply's purchase of the DRCs was accomplished by the dealers forwarding those documents to Supply's Jacksonville, Florida distribution center for preliminary acceptance. Once that hurdle was cleared, the documents were transferred to Supply's office in Kansas City, Kansas for final approval and purchase. Although it was Acceptance's position that the actual "sale" to Supply took place in Kansas City, the record discloses that Supply's Jacksonville division manager was of the view that the "sale" occurred in Jacksonville. After Supply had purchased the DRC from the dealer, Supply "typically" sold it to Acceptance[1] *500 in Kansas City for the face amount of the DRC, less unaccrued finance charges, thereby providing Acceptance with income in the form of "interest" to be paid by the customer. Notwithstanding passage of the DRC's title to Acceptance, the customer continued to make monthly payments to the local dealer's store where all payment records pertaining to the DRCs were maintained. The dealer, in turn, received a monthly bill from Supply for amounts owing on the various DRCs sold to Supply. The dealer's payment, which was required regardless of whether the customer had paid, was sent to Supply's Jacksonville office for deposit in Supply's Jacksonville bank account. DRC payments, so collected in Florida, were later transferred to Supply's bank in Kansas City, Missouri, where Supply paid Acceptance the interest earned. During this same time frame, Acceptance also paid to Supply a monthly fee for Supply's services in administering collections of the DRCs.

B. Financial Procedures Following November 30, 1973, at Both Dealer and Company Owned Stores in Florida.
The financial and business arrangements between Supply and Acceptance changed in significant aspects after November 30, 1973. As before, Supply continued to purchase DRCs from the dealer stores and to sell those contracts to Acceptance. After November 30, 1973, however, Acceptance's purchase price for a DRC from a dealer became the face amount of the contract, including unearned finance charges, thus eliminating the interest Acceptance had previously earned. In exchange, Supply thereafter paid to Acceptance a "quarterly earnings maintenance fee" in an amount designed to produce for Acceptance earnings of one and one-half times the sum of Acceptance's interest requirements on its corporate debt and amortization of its debt expenses.
Further changes after November 30, 1973 resulted in Acceptance's purchase from Supply of two new types of contracts generated by the company owned stores. First were the "Supply installment contracts" (SICs), which were similar in most respects to the DRCs, the distinction being that they were entered into between the customer and the company store. As with the DRCs, Acceptance's purchase price for the SICs included unearned interest. Unlike the DRCs, the transfer of SICs from the company store to Supply did not go through the Jacksonville office, instead they were forwarded directly to Supply's headquarters in Kansas City, Kansas and there regularly transferred on a monthly basis to Acceptance. Customer payments on SICs were made at the local company store  as had been done with DRCs  where payment records were maintained. Unlike the procedure established for DRCs, the monies collected from SICs were then directly transferred by the stores to Supply's bank in Kansas City, Missouri.
The second type of company store contract purchased by Acceptance after November 30, 1973 was the "Supply revolving account" (SRAs), which were simply customer revolving charge accounts issued through the company store. Such accounts required prior authorization from Supply's Kansas City office, which office then billed the customers on a monthly basis. Forty percent of the SRA customers made their monthly payments at the local company stores, while the remaining sixty percent mailed payments directly to Supply's Kansas City office. Monies collected by company stores from SRAs were transferred by those stores to Supply's Kansas City accounts.
Two final changes in the arrangements between Acceptance and Supply occurred after November 30, 1973: First, Acceptance no longer paid Supply a monthly fee for servicing the various contracts involved. Second, Acceptance and Supply, on December 9, 1974, entered into a "receivables purchase agreement" formalizing procedures *501 that had been in effect since December 1, 1973, relating to the sale by Supply of DRCs, SICs and SRAs to Acceptance. In particular, the agreement provided that Supply, acting as Acceptance's agent, would be responsible for collecting amounts owing on the contracts and for undertaking legal proceedings or repossession of merchandise if necessary.
In 1977, DOR issued a proposed notice of corporate tax deficiencies, totaling $44,179.00 for the tax years 1972, 1973, 1974 and 1975 due to Acceptance's failure to file Florida tax returns for those years. This notice was duly protested. Negotiations followed, but the protest was eventually rejected by DOR in 1979. Acceptance then sought a hearing pursuant to section 120.57, Florida Statutes, which was held on October 12, 1979. In a recommended order issued March 14, 1983,[2] the hearing officer concluded that Acceptance was actually doing business in Florida during the taxable years 1972-1975, through its parent corporation and agent, Supply, and was therefore subject to Florida taxation. Because Acceptance's income was found to be in the form of interest before December 1, 1973, and in the form of other gross income from the operation of a financial organization after November 30, 1973, the hearing officer recommended that Acceptance's protest of the deficiency assessments be denied. On July 19, 1983, DOR entered a final order reaching the same conclusions.

I.
Acceptance contends that DOR erred in imposing corporate tax liability upon Acceptance, first, because Acceptance was neither authorized to do business in Florida, nor was it actually doing business within this state for tax purposes, and, second, even if it met the threshold test of doing business within this state, its income was not properly subject to taxation in Florida. We reject both contentions.

A.
In 1971, the Florida legislature enacted the "Florida Income Tax Code" for the purpose of subjecting "all corporations, organizations, associations, and other artificial entities which derive from this state or from any other jurisdiction permanent and inherent attributes not inherent in or available to natural persons ... . to taxation ... for the privilege of conducting business, deriving income, or existing within this state." Section 220.02(1), Florida Statutes. The term "corporation" includes domestic, i.e., Florida corporations, as well as "foreign corporations qualified to do business in this state or actually doing business in this state." Section 220.03(1)(e), Florida Statutes (emphasis supplied). The first issue presented then is whether Acceptance, a foreign corporation not authorized to do *502 business in Florida, was actually doing business in this state for tax purposes. Both the hearing officer and DOR concluded that, because Acceptance owned or leased no property other than cash and receivables, had no offices or employees, and relied upon and utilized the offices, property and employees of Supply in conducting the business of financing consumer contracts, Acceptance's business activities, in substance, were conducted by and were the direct result of Supply's activities. Therefore Acceptance was found to be actually doing business in Florida because, "but for" Supply's activities on Acceptance's behalf, Acceptance could not have otherwise conducted any business or earned any income.
Acceptance insists that because the phrase "actually doing business" is not defined in Florida's taxing statutes, the test to be applied is set out in Chapter 607, Florida Statutes, for determining if a corporation is "transacting business" within Florida for purposes of regulation under Florida's "General Corporation Act." In particular, reliance is placed on section 607.304, Florida Statutes, regulating the right of foreign corporations to transact business within this state. It provides, in pertinent part:
(2) Without excluding other activities which may not constitute transacting business in this state, a foreign corporation shall not be considered to be transacting business in this state, for the purposes of this act, by reason of carrying on in this state any one or more of the following activities:

* * * * * *
(g) Creating, as borrower or lender, or acquiring, indebtedness, mortgages, or other security interests in real or personal property.

(h) Securing or collecting debts or enforcing any rights in property securing the same.

(emphasis supplied) It is Acceptance's position that because it acquires indebtednesses or other security interests in personalty, or secures or collects debts or enforces rights in property securing debts, it is therefore not transacting business in Florida for purposes of Chapter 607 and therefore cannot be said to be actually doing business in Florida for purposes of corporate taxation. This argument, which was rejected by both the hearing officer and DOR, ignores the general rule recognizing that
[w]hile decisions relating to what constitutes doing business within the contemplation of other provisions of law may prove helpful in determining what constitutes doing business within the meaning of the tax laws, they are not controlling, and it has been said that a broader meaning is to be given the words "doing business" when used in a tax statute.

84 C.J.S. Taxation § 188(b) (1954) (emphasis supplied). Applying this rule in Rochester Capital Leasing Corporation v. Sprague, 13 Ariz. App. 77, 474 P.2d 201 (1970), a case involving a foreign corporation's right to maintain an action in the courts of Arizona, the appellate court of Arizona observed:
It is apparent from an analysis of the decisions concerning the doing business question that generally the courts require a much stronger showing of instate activities in order to invoke the sanctions of corporate qualification statutes than is required to subject the foreign corporation to local taxation or to state court jurisdiction through service of process.

474 P.2d at 203 (emphasis supplied). Accord Matter of Heftel Broadcasting Honolulu, Inc., 57 Haw. 175, 554 P.2d 242 (1976); 18A W. Fletcher, Cyclopedia of the Law of Private Corporations § 8804 (Rev. Ed. 1977) [Fletcher]. Similarly, the resolution of whether a foreign corporation is doing business for tax purposes "necessitates a much broader meaning to be given to the words than in the case of service of process." John Ownbey Company, Inc. v. Butler, 211 Tenn. 366, 365 S.W.2d 33, 38 (1963). See generally Note, Three Kinds of Doing Business, 23 Corp. J. 163 (1962).
*503 In enacting Florida's corporate tax statutes, the legislature has expressly stated that its intent was to "`utilize, to the greatest extent possible, concepts of law which have been developed in connection with the income tax laws of the United States... .', thus enabling Florida taxpayers to `piggyback' on the provisions of the IRC." Department of Revenue v. American Telephone and Telegraph Company, 431 So.2d 1025, 1027 (Fla. 1st DCA 1983), citing, Section 220.02(3), Florida Statutes (Supp. 1972) and England, Corporate Income Taxation in Florida: Background, Scope, and Analysis, Symposium, Fla.St.L.Rev. 4, 10 (1972). With that directive in mind we must therefore turn to federal case law in determining the requisites of doing business for tax purposes, rather than to Chapter 607, as Acceptance contends.
A review of the pertinent federal authorities discloses that since the United States Supreme Court handed down its landmark opinion in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the "contact" or "nexus" theory has been applied in deciding the issue of whether the foreign corporation can be said to be actually doing business within the state seeking to impose taxes. Annotation, 67 A.L.R.2d 1322, 1330 (1959). The above test is met if there exists "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." P. Hartman, Federal Limitations on State and Local Taxation, § 2:3 at p. 20 (1981) (emphasis supplied).
A state taxing authority does not offend the due process clause by taxing the income of a foreign corporation generated in interstate commerce if the following two requirements are met:
A "minimal connection" between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise.
Mobil Oil Corporation v. Commissioner of Taxes of Vermont, 445 U.S. 425, 436-437, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980). Accord Exxon Corporation v. Wisconsin Department of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980). See generally 4 Z. Cavitch, Business Organizations § 79.02 (1982); Fletcher, supra at § 8804.2.
In determining whether minimum contacts exist between the corporation and the taxing state, single isolated acts are not determinative; rather, the effect of all of the combined acts of the corporation is to be considered. Fletcher, supra at § 8804.1. Each case must, accordingly, turn on its own particular facts. For example, it was decided in Refrigeration Discount Corporation v. Metzger, 10 F. Supp. 748 (M.D.Pa. 1935), that a Michigan subsidiary corporation of the Kelvinator Corporation, which was in the business  like Acceptance  of financing consumer purchases, was subject to taxation in Pennsylvania as a result of part, but not all, of its activities within that state. The foreign corporation was found to be doing business for purposes of Pennsylvania taxation by virtue of its "floor plan" financing scheme, whereby a Pennsylvania bank was requested to act as agent for the corporation in transferring the commercial paper involved in the transaction to Michigan. In those instances, however, in which the finance company used "bailment leases" and "conditional sales contracts," requiring that all paper work be done in Michigan, the court determined that such sales were not subject to Pennsylvania taxation.
Florida case law on the subject has observed the above test. Thus, in Green v. Burroughs Corporation, 137 So.2d 595 (Fla. 1st DCA 1962), minimum contacts sufficient to justify imposition of Florida's intangibles tax were not present in that Burroughs' Florida office had no authority to extend credit for consumer sales. Instead, all orders and credit applications were directed to be sent to its regional office in Georgia, customers were billed from Georgia and remitted payment to that office, all payment and credit records were maintained in Georgia, and the Florida office *504 could not, on its own, institute legal action against delinquent accounts.
In light of the foregoing decisions, we agree that the hearing officer and the DOR were correct in concluding that Acceptance was actually doing business in Florida within the contemplation of the state corporate income tax statutes. Acceptance, a financing corporation with no offices, employees or property, could only carry out its business through its parent corporation. The receivables purchase agreement between Acceptance and Supply, which admittedly formalized prior procedures, provides that Supply is to act as Acceptance's agent, in Florida and elsewhere, in collecting monies owing on contracts purchased by Acceptance. Unlike the situation that existed in Allis-Chalmers Credit Corporation v. State, Department of Revenue, 408 So.2d 703 (Fla. 1st DCA 1982), in which credit was extended by Chalmers' out-of-state subsidiary to Florida customers, credit in the case at bar was actually extended to customers serviced by the Florida dealer or company store located in Florida. Once that transaction was complete, the contracts were, before December 1, 1973, sent to Jacksonville for preliminary approval, and, after that date, were forwarded to Kansas City for approval. For the most part, Florida customers made payments on the contracts at their local Florida stores, with the monies either being deposited first in Supply's Florida accounts, or being transferred directly to its bank in Missouri. Finally, Supply was authorized to make use of Florida's judicial system in collecting amounts owing on the contracts or in repossessing the goods when necessary. The facts in this case, which are not in dispute, lead to the inescapable conclusion that both the hearing officer and DOR were correct in concluding that Acceptance was actually doing business in Florida for tax purposes. Because the findings and conclusions of the hearing officer and DOR are in agreement, are supported by competent substantial evidence, and are not clearly erroneous or unauthorized, we are unable to accept appellant's position that reversal is required.[3]

B.
Acceptance alternatively contends that if it is actually doing business in Florida, it is, like Allis-Chalmers Credit Corporation, not subject to Florida taxation. In resolving this issue, it should not be overlooked that before December 1, 1973, Acceptance's income was in the form of interest, but after November 30, 1973 its sole income was in the form of a quarterly earnings maintenance fee provided by Supply. Acceptance argues that ordinarily the term "sales," for purposes of corporate taxation, does not include interest, section 220.15(1), Florida Statutes, except in the case of "financial organizations" which, Acceptance insists, it is not. See Section 220.15(2), Florida Statutes. This position is refuted, however, by our decision in Allis-Chalmers, wherein we observed that Allis-Chalmers Credit Corporation was a financial institution for purposes of Florida taxation. 408 So.2d at 705. Acceptance, which is also in the business of financing consumer purchases, must of necessity come within that classification.
Assuming next for the purpose of its argument that Acceptance is a financial organization, Acceptance nevertheless urges that its income is exempt from taxation, because such income does not satisfy the requisites of section 214.71(3)(b), Florida Statutes, relating to the apportionment of income for taxation. This statute provides in pertinent part:
(b) Sales of a financial organization, including, but not limited to, banking and *505 savings institutions, investment companies, real estate investment trusts, and brokerage companies, shall be in this state if derived from:

* * * * * *
3. Interest and dividends received within this state;

* * * * * *
5. Any other gross income resulting from the operation as a financial organization within this state.

In support of its position, Acceptance points to Florida Administrative Code Rule 12C-1.15, adopted by DOR, which provides that the requisite provided in section 214.71(3)(b)3., that interest be "received within this state", is satisfied only when such interest is "earned (not simply received) in this state." (emphasis supplied) It is urged that Acceptance's interest income prior to December 1, 1973 was not "earned" in Florida, as required by the Allis-Chalmers rule, holding that all payments of interest by Florida customers made directly to that company's Atlanta office were neither received nor earned in Florida. Acceptance's reliance on Allis-Chalmers, as well as rule 12C-1.15, is, however, misplaced. First, it is undisputed that before December 1, 1973, all DRC customers made payments, including interest, at dealer stores in Florida. The dealers, in turn, forwarded the payments to Supply's Jacksonville office, which in turn were deposited in Supply's Jacksonville bank. Monies thus collected in Florida were later forwarded to Supply's bank in Kansas City, Missouri, where Acceptance was finally paid. Second, Acceptance's argument ignores the remainder of rule 12C-1.15 which, in defining what is meant by "earned" interest, provides that the following activities will be considered Florida "sales":
(i) Interest received on loans secured by real property located in this state, irrespective of place of receipt;
(ii) Interest received on unsecured loans or loans secured by personal property which are made from offices located in this state, irrespective of place of receipt;
(iii) Other interest and dividends received by offices located in this state.
Although subparagraph (i) obviously is inapplicable, subparagraphs (ii) and (iii) apply in this case to make interest received on DRCs "earned" within Florida.
As to its quarterly earnings maintenance fee income received after November 30, 1973, Acceptance contends it was error to classify such income as "other gross income resulting from the operation as a financial organization within this state", pursuant to section 214.71(3)(b)5. In Allis-Chalmers, this court approved of the hearing officer's conclusion that because interest is included in subparagraph three of that section, interest cannot, by application of the rule expressio unius est exclusio alterius, be included within the category of "other gross income" in subparagraph five. 408 So.2d at 705. As the foreign corporation in Allis-Chalmers had no income other than interest, which was not earned in Florida, no tax liability existed. Here, however, Acceptance earned no interest income after November 30, 1973 and, because it is a financial organization, we do not find it unreasonable to conclude, as did the hearing officer and DOR, that maintenance fee income may be classified as "other gross income" and therefore be subjected to state taxation. Finding no error, we affirm the assessment of tax deficiencies against Acceptance.

II.
Acceptance finally argues that DOR erred in assessing penalties against it due to its failure to file Florida corporate tax returns. Section 214.41(1), Florida Statutes, provides that "[i]f any part of a deficiency is due to negligence or intentional disregard of rules and regulations prescribed by or under applicable law" a penalty shall be added to the deficiency. Section 220.22, Florida Statutes, provides that "[a] return with respect to the tax imposed by this code shall be made by every taxpayer for each taxable year in which such taxpayer either is liable for tax under this code or *506 is required to make a federal income tax return, regardless of whether such taxpayer is liable for tax under this code." (emphasis supplied) In recommending the imposition of penalties in this case, DOR's examiner explained:
Penalties set out above are recommended because taxpayer's parent furnishes all services of its experienced tax department, which files all federal and state returns, and is presumed to know the law. No inquiries nor non-taxable returns were submitted in Florida to alert the State of taxpayer's existence and the nature of its business. There does not appear to be reasonable cause for failure to file timely returns, and such failure is held to be negligence because no action was taken to determine taxability.
Both the hearing officer and DOR found that competent substantial evidence existed to support imposition of penalties and we agree. Acceptance argues simply that its failure to file Florida tax returns stems not from willful neglect, but from a reasonable belief that it was not subject to Florida taxation. In Florida, however, a "good faith belief that [an activity is] not taxable, without more, [is] insufficient to prompt a reduction" in tax penalties. Win-San Building Corporation v. State, Department of Revenue, 358 So.2d 112, 114 (Fla. 3d DCA 1978). Accord State, Department of Revenue v. Zuckerman-Vernon Corporation, 354 So.2d 353 (Fla. 1977). If a taxpayer in good faith believes he is not subject to taxation, the proper remedy is to pay the tax under protest and then sue to recover any overpayment. Zero Food Storage v. Department of Revenue, 330 So.2d 765, 767-768 (Fla. 1st DCA 1976). Under the circumstances, there was no error in DOR's imposition of penalties.
To summarize, we find the department's final order to be supported by competent substantial evidence, and to be neither clearly erroneous nor unauthorized.
AFFIRMED.
ZEHMER, J., concurs.
BOOTH, J., dissents.
BOOTH, Judge, dissenting:
The question presented is whether a foreign subsidiary corporation that can be said to derive income from the activities of its parent corporation in Florida is subject to Florida income tax. I would hold not. Barring fraud or improper purpose, not a factor here, a nonresident subsidiary is not made a "taxpayer" subjected to Chapter 220, Florida Statutes, based on what the parent corporation does within the borders of this State.
During the brief period of the so-called "unitary tax" (September 1, 1982, through August 31, 1984), "unitary business group" was a defined entity,[1] and DOR was directed to ignore the separate corporate entities within the business group and include in the tax base the taxable income of all members of the unitary business group wherever located.[2] Even under that controversial[3] and now defunct tax, the subsidiary *507 here would not have been taxed, though its income might have been included in the tax base of the parent corporation.[4]
Prior to the enactment of the unitary tax, Florida based its tax on total taxable income of each corporate taxpayer subject to its jurisdiction and could have included the income of separate corporate divisions of the taxpayer even though those divisions were not doing business in Florida. Except for the unitary tax period, however, Florida has not applied any unitary "concept" to allow taxation of the income of one corporation based on what another corporation did in this State.[5]
An exception to that rule would no doubt arise if the corporate organization were designed to accomplish an improper purpose. DOR does not contend, however, that the parent/subsidiary corporations here were organized for any improper purpose. Therefore, we have valid business organizations consisting of (1) a parent corporation qualified to do business in Florida and taxable in Florida as a separate corporate entity, and (2) the putative taxpayer in this case, a subsidiary corporation in another state whose existence is dependent on, and interrelated with that of, the parent corporation. This interrelation and dependency, a common feature of parent/subsidiary corporations, is the sole basis claimed for attributing to the subsidiary the business activities of the parent corporation performed in Florida.
The order sought to be reviewed determines that the parent corporation was acting as the agent for the subsidiary, and therefore the subsidiary was "actually doing business in Florida." Sections 220.03 and 220.11, Florida Statutes. This rationale will allow DOR to effectively reach for tax purposes the income of separate nonresident corporations affiliated with a Florida corporation to as great or greater an extent than was allowed by the unitary tax theory repealed in 1984. If this interpretation of "actually doing business" were correct, *508 then the unitary tax need never have been enacted.
The basic difficulty with DOR's new theory is the total lack of case precedent or statutory authority. An indication of the weakness of its position is DOR's reliance on such inappropriate authorities as: cases interpreting the Florida long-arm statute (Section 48.181, Florida Statutes) to allow suit against a nonresident corporation based on activities performed in Florida;[6] cases applying the "minimum connection" or "nexus" standard to determine minimum requirements satisfying due process and interstate commerce clauses for taxation of out-of-state residents and activities, the issue there being constitutional law (what could be taxed) rather than statutory interpretation (what is taxed);[7] and one lone "form over substance" documentary stamp case.[8]
Both sides in the instant case cite and to some extent rely on the Allis-Chalmers Credit Corporation case of 1982,[9] but there is an important distinction which must not be overlooked. In the Allis-Chalmers case, the credit corporation was doing business in Florida and was subject to corporate income tax. That was not an issue.[10] The issue was the calculation of the tax base and apportionment under Section 214.71, Florida Statutes. The case holds that certain interest income was not includable in the apportionment formula as Florida sales.
In the instant case, unlike Allis-Chalmers, the question is whether the taxpayer was doing business in Florida. An example of DOR's confusion on this point is its brief, which compares the activities of Western Auto Supply (the parent corporation qualified to do business in Florida) with the activities of the subsidiary credit corporation in Allis-Chalmers,[11] (also without question doing business in Florida). Since there is no issue here as to whether the activities of Supply (parent corporation), including its sales, intangibles,[12] and corporate income, are subject to tax in Florida, the comparison is not helpful.
This case is covered by the time-honored rule that the taxing authority must clearly establish that the entity sought to be taxed *509 is within the terms of the taxing statute. Any doubt must be resolved against the taxing authority. 50 Fla.Jur.2d Taxation §§ 10:12, 10:14, and cases cited therein. The Legislature did not provide for the taxation of the subsidiary corporation in this case and, in fact, repealed the unitary tax which came the closest to achieving that result. I would reverse the order below.
I also dissent from the majority's affirmance of the imposition of penalties against the taxpayer. Section 214.41, Florida Statutes, provides:
If any part of a deficiency is due to negligence and intentional disregard of rules and regulations prescribed by or under applicable law, but without intent to defraud, this shall be added to the tax as a penalty in amount equal to five percent of the deficiency. [emphasis added]
A careful analysis of the statutes and case laws of Florida fails to disclose, even to the most conscientious taxpayer, a basis for the imposition of the tax here, and therefore no penalty should be imposed, even if the tax is ultimately sustained. The agency itself is uncertain in this regard and has been unable to establish a clear basis for the assessment although almost ten years have passed since the assessment was made.[13]
I respectfully dissent.
NOTES
[1] The retail installment sales agreement entered into between the customer and the dealer actually provides that "title to this retail installment sales contract or an interest herein has been transferred to and is owned by Western Acceptance Company." (emphasis supplied)
[2] There is some dispute as to the cause of the delay in issuance of the recommended order. The hearing officer found that the parties had waived the requirement found in Florida Administrative Code Rule 28-5.402 that a hearing officer must file a recommended order within thirty days of the hearing or receipt of the hearing transcript, whichever is greater, by requesting a stay of the proceedings pending settlement negotiations. Acceptance disavows any knowledge of that request and contends that the recommended order, and therefore the final order, is invalid for failure to comply with the 30-day rule. We do not agree that reversible error occurred for the following reasons: First, although Acceptance insists it knew nothing of the requested stay and purported settlement negotiations, it is clear that Acceptance at the very least acquiesced in the delay by failing, for some two and one-half years, to insist that a recommended order be entered. Second, and most important, is the fact that section 120.68(8), Florida Statutes, the "harmless error rule for agency action", applies where time limits imposed by Chapter 120 are not met. Department of Business Regulation v. Hyman, 417 So.2d 671, 673 (Fla. 1982). Reversal of agency action simply because an order is not timely entered is improper unless its untimely entry results in impairment of the fairness of the proceedings or the correctness of the action and in prejudice. Id. Accord G & B of Jacksonville, Inc. v. State, Department of Business Regulation, 362 So.2d 951 (Fla. 1st DCA 1978). As DOR notes, Acceptance made no such showing below and the record fails to support any notion of prejudice. We therefore reject Acceptance's position that alleged procedural improprieties require reversal of this case.
[3] The dissent asserts that there is no case precedent or statutory authority clearly establishing that Acceptance is within the terms of the taxing statute. Because, however, chapter 220 subjects foreign corporations "actually doing business in this state" to taxation, and since the foregoing federal case law as applied to the facts before us indicates that Acceptance was actually doing business in Florida, we consider that the legislature has expressed an intent to tax the income of subsidiary corporations such as Acceptance. Therefore, unlike the dissent, we see no reason to apply the rule that a taxing statute must be construed strictly in favor of the taxpayer.
[1] The "unitary tax" adopted in 1983 (83-349, Laws of Florida) was repealed in 1984 (84-549, Laws of Florida). See Landry & Gragg, "Florida's `New' Unitary Corporate Tax," 57 Fla. Bar J. 573, 576 (Oct. 1983); Chapter 83-349, Laws of Florida, § 2:

"Unitary business group" means a group of taxpayers related through common ownership whose business activities are integrated with, are dependent upon, or contribute to a flow of value among members of the group.
[2] Landry & Gragg, "Florida's `New' Unitary Corporate Tax," 57 Fla. Bar J. 573, 576 (1983):

In very general terms, the unitary method enacted by SB 3C rejects separate corporate existence in arriving at a particular taxpayer's tax base. Instead, it determines the composition of the unitary business. If this unitary business crosses corporate lines, then despite the fact that a particular corporation part of the unitary business is not doing business in Florida, for purposes of determining the tax base of those members which are doing business in Florida, it includes the taxable income of all members of the unitary business.
[3] 54 Fla.Jur.2d Taxation § 41.87 (Cum.Supp. Jan. 1985 at p. 92): "The Legislature at a special session held December 6 and 7, 1984, repealed the controversial unitary tax... ."; Landry & Gragg, infra at p. 575: "[T]he legislation changed the Florida business tax climate `from the most hospitable, fair and accommodating in the country to the most hostile, heavy handed and greedy.'"
[4] Weissman, "A Primer on Florida's Unitary Method of Corporate Taxation and Capitalizing on its Idiosyncrasies," 58 Fla. Bar J. 38, 40 (Jan. 1984):

Since it is a constant area of confusion, it is important to reiterate that the unitary method does not tax corporations which are members of a unitary business not doing business in Florida, but includes the income of those corporations in the tax base of a member corporation that is doing business in Florida to determine that corporation's Florida income tax.
[5] Gragg & Phipps, Florida State and Local Taxes, § 12.08[1], p. 532:

Few people realize that Florida applied the unitary tax concept before the enactment of the 1983 legislation. Florida used the domestic taxable income of each corporate taxpayer as the tax base despite the fact that the taxpayer might have several totally separate functional divisions that were not doing business in Florida, unless the taxpayer could establish that it was entitled to separate accounting treatment. Florida, however, had limited its application of the unitary concept in two significant respects. First, it had not applied the unitary principle to multicorporate enterprises; i.e., if a portion of an otherwise unitary business was conducted in another corporation and that corporation was not doing business in Florida, that corporation's taxable income was not included in determining the tax base of the corporate member of the unitary business that was doing business in Florida. [emphasis added]
Gragg & Phipps, Florida State and Local Taxes, § 12.08[3][a], p. 537:
In Butler Brothers [v. McColgan, 17 Cal.2d 664, 111 P.2d 334 (Cal. 1941)] there was one corporation owning as parts of the unitary system seven different branches in seven states. In the Edison California Stores [v. McColgan, 30 Cal.2d 472, 183 P.2d 16 (Cal. 1947)] case there was a parent corporation owning and controlling as units of one system 15 different corporations in as many states. The Court held no difference in principle was discernible.
Before the 1983 legislation [unitary tax], the Florida courts could have reached the same conclusion reached by the California court in Butler Brothers because the taxpayer's business was conducted in one corporate entity. Under prior law and regulations, the result in Edison California Stores could not have been reached in Florida because the business was conducted in separate subsidiary corporations. Under the new Florida law and regulations, the taxpayer could be considered unitary a [sic] business group even though its operations are conducted in separate corporate subsidiaries. [emphasis added]
[6] Readers Digest Association v. State, 251 So.2d 552 (Fla. 1st DCA 1971) (nonresident publisher circulating magazine within state urging violations of law held subject to suit in state).
[7] Mobil Oil Corporation v. Commissioner, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); Exxon Corporation v. Wisconsin Department of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980).
[8] River Park Joint Venture v. Dickinson, 303 So.2d 654 (Fla. 1st DCA 1974) (no documentary stamp tax due on a transfer of title to property from legal title holder to equitable title holder).
[9] Allis-Chalmers Credit Corp. v. Department of Revenue, 408 So.2d 703 (Fla. 1st DCA 1982).
[10] The majority's description of the case as one determining that the corporation was doing business for Florida tax purposes is, I believe, incorrect.
[11] Brief of DOR, p. 35:

The granting of credit by Supply was initially reviewed and approved or rejected by Supply's Jacksonville office. Payments were also received by Supply at its Jacksonville office. Supply, through its review of the agreements in Florida and its receipt of payment in Florida, was receiving interest that was in substance, received and ultimately transferred to Acceptance, which constituted a Florida sale.
In addition to independent dealers located in Florida, Supply operated its own stores in Florida. It should be kept in mind that those stores were not separate entities but were a part of Supply's corporate organization. Installment contracts and revolving accounts were approved by these stores and therefore Supply was, in fact, directly granting credit in Florida. Records concerning the payment of these installment contracts were made directly to the Supply stores in Florida. Supply's activities, as stated above, were in substance activities of Acceptance. [emphasis added]
[12] Allis-Chalmers Credit Corp. v. Department of Revenue, 456 So.2d 899 (Fla. 1st DCA 1984) (taxpayer corporation doing business in Florida held subject to intangible tax under Chapter 199, Florida Statutes, on notes receivable arising out of sale of property regardless of where notes were held); Allstate Enterprises v. Department of Revenue, 398 So.2d 849 (Fla. 1st DCA 1981) (retail sales corporation qualified to do business in Florida held liable for intangible tax on promissory notes sold to its subsidiary finance company where seller retained control of notes kept in another state).
[13] Tax years 1972 through 1975 are involved. Notice of deficiency was sent in 1977, but was held in abeyance until May 20, 1982, when case was reopened on motion of DOR over opposition of taxpayer.