**FIRST NATIONAL LEASING AND FINANCIAL CORP., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–9105–TA–00024.

Tax Court of Indiana.

Aug. 19, 1992.

Brian K. Peters, Brian W. Welch, McHale Cook & Welch, P.C., Indianapolis, C. Clark Germann, Michael C. Connelly, Peggy J. Ryan, Sorling, Northrup, Hanna, Cullen and Cochran, Ltd., Springfield, for petitioner.

Linley E. Pearson, Atty. Gen., Ted Holaday, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

First National Leasing and Financial Corporation (First National) petitions the court to set aside the final determination of the Indiana Department of State Revenue (Department) assessing Indiana gross income tax in the amount of $25,432.97 plus interest and penalties on its rental income received from the lease of equipment to its wholly owned subsidiary, Hulcher Services, Inc. (Hulcher) from September 30, 1976, through September 30, 1986.

## FACTS

First National, currently known as First Financial Resources, Incorporated, is a Delaware corporation. First National's corporate headquarters were located in Virden, Illinois, until 1985, when they relocated in Denton, Texas. Hulcher is presently a wholly owned subsidiary of First National, separately incorporated in Delaware and similarly headquartered in Virden, Illinois, until also moving to Denton, Texas in 1985.

While located in Illinois, both corporations had their central offices in the same one-story 8,000 to 10,000 square foot building, Hulcher in one wing and First National in another. Following the September 1985 move to Texas, both corporations continued to be located in the same building, a one story, three-wing building of approximately 12,000 square feet. Once again, however, each corporation is in a separate wing, the third wing occupied by a second First National subsidiary. The employees of the two corporations were distinct until 1984 when, for reasons of efficiency, accounting personnel were consolidated and put on First National's payroll to do accounting for both companies.

From 1975 to 1978, Glen Hulcher was the sole shareholder of First National and his father, Melvin Hulcher, was the sole shareholder of Hulcher Services. During this period, the corporations apparently had no common officers. In 1978, Glen and Melvin each became fifty percent (50%) shareholders of First National, and in turn, First National purchased one hundred percent (100%) of the stock of Hulcher. In 1979, Melvin completely redeemed his stock in First National. Thereafter, Glen was the president and James S. Swanson was the secretary-treasurer for both companies. The positions of vice-president were held by different people, however, during the years at issue.

First National's primary business is leasing equipment to Hulcher. In addition, however, First National performs accounting and administrative services for Hulcher, exclusive of any written agreement. During the years at issue, First National received income derived from its equipment leasing agreements with Hulcher.

Hulcher leases equipment from First National for use in its train derailment business, picking up train wrecks and either

putting them back on the track or clearing the track. The leased equipment includes big over-the-road trucks, tractors, lowboy trailers, pick-up trucks, cranes, miscellaneous generators and light plants, and caterpillar tractors with side booms for lifting.

Hulcher operates in the eastern two-thirds of the United States from nineteen equipment bases scattered throughout the country. Hulcher stores the leased equipment at its equipment bases until it is called into action. One of Hulcher's equipment bases is located in Bluffton, Indiana. The Bluffton division was conceived and developed exclusively by Hulcher. A variety of Hulcher's leased equipment is located at the Bluffton site, which has eight employees.

When a train derails, the railroad calls Hulcher's Texas headquarters, which then dispatches equipment from its various bases to meet the needs of the situation. For the twenty-three months prior to First National's administrative hearing, Hulcher operated the equipment stored at Bluffton in Indiana for thirty-seven percent (37%) of its total operating time. The rental payments made by Hulcher to First National are based on a flat percentage, negotiated annually, and determined independent of the amount of revenue generated by Hulcher from the use of the Indiana based equipment.

Whenever Hulcher needs new equipment, it supplies the specifications to First National, which in turn places the order with a manufacturer. First National obtains financing to purchase the equipment and is the titled owner of the equipment. When the newly manufactured equipment is ready for delivery, Hulcher and First National enter into a lease agreement, which is negotiated at their corporate headquarters. First National then directs the delivery of the equipment to Hulcher outside Indiana. First National does not pick up the equipment from the manufacturer and never uses the equipment. Moreover, First National does not control where the equipment is used or stored. Indeed, Hulcher, in its sole discretion, locates the equipment at one of its bases and routinely relocates its equipment as well as its bases of operation without any involvement by First National.

First National and Hulcher entered a master lease agreement that covers all the property Hulcher rents. The basic lease terms require Hulcher to pay for the repair, storage, and insurance of the equipment. Furthermore, the master lease refers to attachments or exhibits that detail the individual pieces of equipment. Until 1978, each piece of leased equipment was separately scheduled. Separate scheduling is, however, no longer done unless it is required for financing purposes.

Hulcher has substantial contact with Indiana. Hulcher is an Indiana taxpayer, which warehouses equipment, performs services, and employs residents of Indiana. On the other hand, First National does not have an office, warehouse, or distribution center in Indiana, nor does it deliver equipment or have salesmen or other employees in the state. First National has never received rental payments in Indiana from Hulcher, nor has Hulcher made a lease payment from Indiana. Furthermore, First National has never filed as a taxpayer in Indiana, but is a taxpayer in Texas.

Additional facts appear below as necessary.

## ISSUES

The parties assert several issues that the court restates as follows:

I. Is First National's gross income from leasing equipment to its wholly owned subsidiary, which stores and uses the equipment within Indiana, derived from "sources within Indiana" within the meaning of IND.CODE 6-2.1-2-2(a)(2)?

II. If First National's rental income is derived from "sources within Indiana," is it "taxable gross income" under IC 6-2.1-2-2(a)(2) or is it exempt from tax under IND.CODE 6-2.1-3-3 and the Commerce Clause of the United States Constitution?

## DISCUSSION & DECISION

Initially, the court observes that the parties have been seduced, as in today's previ-

ous two decisions,[1] into leaping over issues concerning the imposition of tax under Indiana's statutes by the allure of Constitutional arguments. Indeed, the Department contends that First National's rental income is subject to tax under IC 6–2.1–2–2(a)(2) (formerly IND.CODE 6–2–1–2), 45 I.A.C. 1–1–49, and 45 I.A.C. 1–1–84 because a sufficient nexus exists for the state to impose tax under the four-part test in *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 277–78, 97 S.Ct. 1076, 1078, 51 L.Ed.2d 326, and the decision in *Goldberg v. Sweet*, (1989), 488 U.S. 252, 257–58, 109 S.Ct. 582, 587, 102 L.Ed.2d 607. The Department's contention suggests that Indiana's imposition statutes have no independent vitality but are properly construed by applying only Constitutional standards. Nevertheless, as has already been stated today: "The court's consideration [ ] must follow the analytical framework demanded by the imposition statute and well-settled Indiana law, recognizing that '[c]ourts will not decide Constitutional questions unless such a determination is necessary.'" *Indiana–Kentucky Elec.*, at 661 (quoting *Bethlehem Steel*, at 1330). To reposition the cart where it belongs, behind the horse, the court therefore will consider the taxability of the gross income at issue according to the requirements of IC 6–2.1–2–2(a)(2):

> A three-step analysis is required to determine the taxability of a non-resident: (1) are the receipts "gross income," [2] (2) is the gross income derived from "sources within Indiana," and (3) is the gross income that is derived from sources within Indiana "taxable gross income"? [3]

*Indiana–Kentucky Elec.*, at 661 (citing IC 6–2.1–2–2(a)(2); *Bethlehem Steel*, at 1329) (footnotes in original).

The parties do not dispute that First National's rental income is "gross income" under IC 6–2.1–1–2. The court consequently considers first whether First National's rental income is derived from "sources within Indiana" within the meaning of IC 6–2.1–2–2(a)(2). Indiana courts and the Department's regulations agree that income has an Indiana "source" when a taxpayer has an Indiana "business situs" at which activities related to the transaction giving rise to the income (the critical transaction) are more than minimal, not remote or incidental to the transaction, *i.e.*, the income has an Indiana "tax situs." *Indiana–Kentucky Elec.*, at 663.

### "BUSINESS SITUS"

First National asserts it does not have an Indiana "business situs" because it does not maintain an office, warehouse, inventory, or employees in Indiana, nor does it perform services, conduct sales, accept or receive rental payments, or negotiate contracts in Indiana. Furthermore, First National maintains that although it owns derailment equipment located in Indiana, it had no control over its location in the state.

■ The Department, on the other hand, asserts First National has an Indiana "business situs" because a portion of the equipment it owns and leases to Hulcher is located in Indiana. A "business situs" is established in Indiana by the "[o]wnership, leasing, rental or other operation of income-producing property ..." in the state. 45 I.A.C. 1–1–49(6). Rules used to construe the meaning of a statute equally apply when construing the meaning of administrative rules and regulations. *Rogers v. State Bd. of Tax Comm'rs* (1991), Ind.Tax, 565 N.E.2d 398, 402 (citing *Don Meadows Motors, Inc. v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 518 N.E.2d 507, 508). Words in a statute, and therefore words in regulations, are used in their plain, ordinary, and usual sense. IND.CODE 1–1–4–1(1). "It is axiomatic in Indiana that the plain, ordinary, and usual meaning of non-technical words in a statute is defined by their ordinary and accepted dictionary meaning. *Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State*

---

**1.** *Bethlehem Steel Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 597 N.E.2d 1327; *Indiana–Kentucky Elec. Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 598 N.E.2d 647.

**2.** IND.CODE 6–2.1–1–2.

**3.** IC 6–2.1–1–13.

644

*Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 581, *aff'd*, (1992), Ind., 585 N.E.2d 1336. The ordinary and accepted meaning of the word "operation" is "a doing or performing esp[ecially] of action: WORK, DEED. . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1981). The use of the word "operation" in the regulation 45 I.A.C. 1–1–49(6) indicates an active participation in the listed activities of "ownership, leasing, or rental" is necessary for the establishment of a "business situs" in Indiana. First National claims it exerts no control over the location of its leased equipment and often has no knowledge of the location of the equipment, but rather is a passive rather than active participant in the ownership of the property in Indiana.

■ The Department claims, however, that First National has control according to the master lease with Hulcher. The terms of the lease provide that First National has the right to inspect the leased equipment and observe its use, has the right to demand notice of the location of the equipment, may take possession of the equipment upon default, and implies that First National gives consent for the locations of its equipment.

As a general rule, Indiana determines tax consequences based on the substance not the form of a transaction. *Bethlehem Steel*, at 1331 (citing *Monarch Beverage v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 589 N.E.2d 1209, 1215). Although the master lease contains provisions suggesting First National actively participates in Hulcher's location of the equipment, by consenting to its location or at the least knowing or having the ability to know where the equipment is located, the evidence demonstrated Hulcher's location of equipment is completely independent from First National. First National does not in reality consent to or even, many times, have knowledge of the location of the leased equipment. The court therefore finds the assertion that First National has an Indiana "business situs" unconvincing.

### "SOURCE" or "TAX SITUS"

■ Assuming *arguendo* that First National has an Indiana "business situs"

based on its ownership of the equipment that Hulcher placed in Indiana, a "business situs" in this state is insufficient, by itself, to impose tax on a non-resident's income. A taxpayer may have more than one "business situs." 45 I.A.C. 1–1–51 (concerning intangible personal property). This is equally true for tangible property, especially mobile property such as the train derailment equipment in the instant case. When a taxpayer has more than one "business situs, the court must determine which is the "tax situs." *Indiana–Kentucky Elec.*, at 662. For example, a steel manufacturer had a "business situs" in Indiana where it manufactured and sold steel; nonetheless, the activities at the Indiana "business situs" that were related to the sale of intangibles were not of a sufficient degree to find the Indiana "business situs" was also the "tax situs." *Bethlehem Steel*, at 1337.

■ The court must determine whether First National's activities related to the lease of equipment to Hulcher, the critical transaction, that occur at its Indiana "business situs" are more than minimal, not remote or incidental to the lease transaction. The Department's regulation requires the identical scrutiny for imposing tax on a non-resident's income:

Imposition of Tax on Nonresidents. The gross income tax is levied upon the total gross receipts of nonresident taxpayers which are derived from activities or businesses in the state or other Indiana sources. Thus the tax on nonresidents is limited basically to receipts *from activities connected with a business situs* (as defined in Regulation 6–2–1–1(m)(330) [45 I.A.C. 1–1–49]) *in the state.*

45 I.A.C. 1–1–84 (emphasis added). Accordingly, the court must ask whether a portion of the income First National receives from leasing equipment to Hulcher is derived from an Indiana "source," *i.e.,* an Indiana "tax situs."

The sole activity First National has in Indiana is ownership of equipment that is located in Bluffton independently of any direction, consent, or, often times, knowl-

edge by First National. The critical transaction in this case is the leasing of property. First National executed its leases with Hulcher in Illinois and Texas, not in Indiana. The leases were not negotiated in Indiana; the equipment was not delivered in Indiana; and the lease payments are not made or received in Indiana. Consequently, none of First National's activities related to the lease contract itself are conducted in Indiana.

The purpose of a lease is to transfer for consideration certain rights in property, generally use and possession. *Indiana Dep't of State Revenue v. Indianapolis Transit Sys., Inc.* (1976), 171 Ind.App. 299, 307, 356 N.E.2d 1204, 1209 (quoting *Thomas v. Foglio* (1961), 225 Or. 540, 358 P.2d 1066). First National, substantively, does not exert control over Hulcher's use or possession of the equipment. Although First National and Hulcher share corporate headquarters and are affiliated corporations, IND.CODE 23–1–43–1, the use and possession of the equipment is directed by Hulcher independent of its parent. When Hulcher is contacted to clear a derailed train from a track, it is contacted at its central dispatching center in Texas. The dispatcher, without consulting or informing First National sends a crew and equipment to clear the train. Furthermore, the master lease contains no provision designating the location of equipment. Hulcher autonomously decides where to locate and relocate the leased equipment at any of its nineteen bases of operations across the country. Even the locations of the bases of operation are determined exclusively by Hulcher's operations manager from corporate headquarters.

Finally, Hulcher derives its income from the use of the Bluffton based equipment not only in Indiana, but also in any state the dispatcher directs. First National, on the other hand, does not derive its rental income from the use of the equipment in Indiana. The same rental payments are required under the lease no matter how rarely or how frequently Hulcher uses the equipment. Nor is the rental income based on the possession of the equipment in Indiana. Indeed, the rental payments are the same regardless of the state in which Hulcher bases the equipment. Consequently, although First National owns the equipment that Hulcher leases, locates, and uses in Indiana and elsewhere, the activities related to the lease formation and execution and the activities related to the purpose of the lease, the use and possession of the equipment, are overwhelmingly in quantity and quality activities conducted by Hulcher, not by First National. The court therefore finds that First National's ownership of equipment located in Indiana is an activity that is not more than minimal, but is remote and incidental to the lease transaction from which its income is derived. Ownership alone is therefore not the degree of activity contemplated by the Indiana gross income tax statute.

## CORPORATE RELATIONSHIP

■ The Department's arguments stress the close relationship between the two affiliated corporations, a parent and its wholly owned subsidiary, which have been owned by the same family throughout their existence. The companies share the same corporate headquarters building, albeit in different wings, exchange certain services without formal contracts, are inattentive to contract terms requiring equipment lists, and share and trade corporate officers. The evidence leaves no room to question the close identity of the two corporations.

The Department suggests the close nature of the relationship between First National and Hulcher would permit the court to overlook their separate corporate forms and view them as one, imputing knowledge, control, and activities from one to the other, in direct contravention of the facts. To do as the Department bids would be to "disregard[ ] the long standing rule established by the United States Supreme Court that a corporation is a separate legal entity, distinct from its stockholders (affiliates) for the purposes of taxation." *Indiana–Kentucky Elec.*, at 657 (citing *Moline Properties, Inc. v. Commissioner of Internal Revenue* (1943), 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499; *Department of Treasury v. Crowder* (1938), 214

Ind. 252, 254–55, 15 N.E.2d 89, 91; *Madding v. Indiana Dep't of State Revenue* (1971), 149 Ind.App. 74, 88, 270 N.E.2d 771, 779). Furthermore, the Department neglects to cite any authority that could induce the court to penetrate the corporate form, but instead, champions unsupported statements impugning the loose definition between the two entities rather than relying on cogent and supported argument.

The proper factual circumstances may permit taxing both a resident subsidiary on the income derived from the location and use of leased equipment in Indiana and its non-resident parent on its rental income derived from its ownership of equipment leased, located, and used by the subsidiary in Indiana. Indeed, supported legal arguments may induce the court to pierce the corporate veil as has been done in other states.[4] Nonetheless, neither the facts nor the arguments put forth by the state in this case persuade the court that the assessment of First National is consistent with Indiana law.

### OTHER JURISDICTIONS

As a postscript, the court observes there is a split of authority in other jurisdictions that have considered issues and facts similar to those in the present case. Contrary to this court's decision, several jurisdictions have upheld the taxation of a non-resident's income derived from the rental of movable personal property even though the taxpayer did not directly engage in locating the property in the taxing state. *American Refrigerator Transit Co. v. State Tax Comm'n* (1964), 238 Or. 340, 395 P.2d 127 (based on the Oregon statute, which stated "income from tangible ... property located or having a situs in this state" was "income derived from sources within th[e] state," and a sufficient nexus to satisfy Due Process requirements of the Fourteenth Amendment); *accord Commissioner of*

*Revenues v. Pacific Fruit Express Co.* (1956), 227 Ark. 8, 296 S.W.2d 676; *Oklahoma Tax Comm'n v. American Refrigerator Transit Co.* (1959), Okla., 349 P.2d 746. For the most part, these cases turned on Constitutional rather than state statutory analyses.

In contrast, several jurisdictions have held, corresponding with this decision, that a non-resident's rental income is not derived from a source in the state when the taxpayer did not directly engage in locating the moveable personal property in the taxing state. *Williams v. American Refrigerator Transit Co.* (1955), 91 Ga.App. 522, 86 S.E.2d 336 (income from lease of moveable property that is located in Georgia by lessee is not income from "doing business in th[e] state" under Georgia statute); *Kentucky Tax Comm'n v. American Refrigerator Transit Co.* (1956), Ky., 294 S.W.2d 554 (under Kentucky's statute, the in-state presence of moveable property is not the source of the rental income, the contract or lease is the source); *cf. Bethlehem Steel*, at 1337; *Indiana–Kentucky Elec.*, at 664–665. Significantly, these decisions were all based upon construction of statutory language, never reaching Constitutional issues.

■ For all the reasons stated above, the court finds the portion of First National's income derived from leasing train derailment equipment to Hulcher, which Hulcher located in Indiana, is not derived from "sources within Indiana" within the meaning of IC 6–2.1–2–2(a)(2) and therefore is not subject to Indiana's gross income tax. As a result of its decision, the court does not reach the questions of whether First National's rental income is "taxable gross income" under IC 6–2.1–1–13, is exempt under the interstate commerce exemption pursuant to IC 6–2.1–3–3, and is taxable

---

4. A sufficient nexus to assert a state's taxing jurisdiction over a non-domiciliary corporation has been accomplished in some states based solely on the non-domiciliary corporation's *agency relationship* with another corporation that has sufficient nexus. In *Western Acceptance Co. v. State of Florida* (1985), Fla.App., 472

So.2d 497, *review denied,* (1986), Fla., 486 So.2d 598, the Florida district court of appeals upheld the imposition of tax on an out-of-state subsidiary corporation based on the in-state activities of the parent because the parent was determined to be acting as the Florida agent of the out-of-state subsidiary. *Id.* at 504.

without offending the Commerce Clause of the United States Constitution.